## WILLIAM GORDON *et al.*

*v.*

## FRANK P. REYNOLDS.

*Filed at Ottawa May 15, 1885.*

1. FRAUDULENT CONVEYANCE—*sale on secret trust for benefit of the grantor—to hinder and delay creditors.* A person being in debt, conveyed his real and personal property to his son, under an agreement made for the purpose, on the part of both, to defeat, hinder and delay a creditor in the collection of his debt, no consideration being paid therefor, and with a secret understanding the son should hold the property for the use and benefit of the father, and reconvey it to him when requested, and if the father did not require a reconveyance, the son to take care of him and provide him with necessaries during his life, and have the property at his death. It was *held*, the sale and conveyance were fraudulent and void as to creditors of the father.

2. Even where the grantee pays a valuable consideration, if a part of the consideration is an undertaking and promise by the grantee to support and take care of the grantor, such an agreement renders the transfer void as to then existing creditors of the grantor.

3. SAME—*distinction as to rights of prior and subsequent creditors.* If the fraudulent grantor reserves no future use or benefit in the property, then the transfer can be attacked only by preëxisting creditors; but where the conveyance is merely colorable, and a secret trust exists for the benefit of the grantor, then the sale is void, both as to precedent and subsequent creditors.

4. SAME—*inadequacy of consideration.* The sale and transfer by a father to his son, of real estate of the cash value of $2500, and personal property of the value of $250, for the price of $500 paid, will be fraudulent as to existing creditors of the father, on account of the gross inadequacy of consideration.

5. WAIVER OF DEMURRER—*by pleading over.* A defendant, by answering a bill in chancery after the overruling of his demurrer thereto, waives his demurrer, except so far as he may have the same advantage on final hearing; and he can not assign for error the ruling upon the demurrer.

6. STATUTE OF FRAUDS—*should be specially pleaded.* The Statute of Frauds can not be relied on as a defence, in any case, unless insisted upon by plea or answer. Without it is thus interposed, a trust resting in parol will be enforced the same as if it was in writing.

7. AMENDMENT—*in chancery—how far matter of discretion.* The granting of leave to amend the pleadings in chancery cases rests in the discretion

of the court; and unless there is an abuse of discretion, the action of the court will not be the subject of review.

8. SAME—*amendment of bill—to avoid a variance—at what time.* An amendment of a bill in chancery is properly allowed on the hearing, in furtherance of justice, to avoid the effect of a variance from the proofs. It is not material when amendments are permitted to be made, except as to the terms the court may impose as a condition thereto.

9. SAME—*in case bill is unnecessarily sworn to.* Where a bill is not required by law to be verified by the oath of the complainant, the fact that it is unnecessarily so verified affords no ground for refusing leave to amend the same.

10. EVIDENCE—*on creditor's bill—acts of debtor.* On the hearing of a bill to subject property conveyed by a judgment debtor to his son, to the satisfaction of the judgment, there is no error in refusing evidence offered by the son to show acts of the debtor done in furtherance of the rights of the creditor, and to aid him in the suit.

11. SAME—*in chancery—receiving evidence subject to objections.* As a general rule, the better practice in chancery cases is to receive evidence subject to such objections as may be taken to it, to be considered on the final hearing, when the court will disregard it, if incompetent, or if competent, give it such weight as it may be entitled to. In such case it will be presumed that the court considered only competent and relevant evidence.

12. WITNESS—*competency—wife for her husband.* On bill to set aside a conveyance made by a judgment debtor as being fraudulent as to creditors, the wife of the grantee defendant is not a competent witness for him, to sustain the alleged *bona fides* of the conveyance.

13. SAME—*impeachment—by proof of inconsistent statements.* Declarations and statements of a witness inconsistent with his testimony, are not admissible in evidence to impeach him, unless where his testimony relates to matters material to the issues, nor then unless his attention has been called to the time, place and persons when, where and to whom he had made his supposed declarations.

14. SAME—*time for offering impeaching evidence—discretion.* Where plaintiff's witness is asked certain questions on cross-examination, for the purpose of laying a foundation to impeach him, and he is again called by the plaintiff in rebuttal, after the defendant has closed his testimony, and asked as to other matters merely in rebuttal, it is a matter of discretion with the court at that stage of the case to allow the defendant to introduce evidence to impeach the witness.

15. ERROR *is obviated by evidence rejected being afterward received.* Error can not be predicated on the refusal to allow a question to be answered by a witness when the witness afterward testifies to the same fact sought to be established by the question.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding.

Mr. E. A. SHERBURNE, for the appellants.

Mr. ELBRIDGE HANECY, for the appellee.

Mr. JUSTICE TUNNICLIFF delivered the opinion of the Court:

On the 3d of March, 1883, appellee exhibited his bill of complaint in the Superior Court of Cook county, against appellants and one Charles Gordon, alleging, in substance, that on that day he had recovered a judgment in said court against said Charles Gordon, for $2103, and costs; that an execution had been issued, and returned no property found; that on the 16th of August, 1876, said Charles Gordon was the owner in fee of lot 12, in Waller's subdivision of block 20, in Bickerdike's addition to Chicago, and also of a large amount of goods and chattels in the buildings on said real estate, and that on said day he pretended to assign and transfer said real and personal property to his son, William Gordon, for the nominal consideration of $500, but that said deed was never delivered and never became operative; that said William never paid said $500, or any part of it, and that said real estate and property were held by said William in trust, for the benefit and use of said Charles; that the consideration of said pretended conveyance was, that said Charles was to have a home on said premises, and was to receive from said property his future support and maintenance during his life; that said William and his wife soon after moved into the house on said premises, and still continue in the possession thereof; that he has never paid anything on account of said pretended conveyance, and that said premises are now held by him in trust for said Charles, and are liable for his debts; that said pretended conveyance was made to secure to said Charles a secret trust therein, and to hinder, delay and defraud his

creditors, and to prevent said property being sold on execution against said Charles Gordon; that $150 of the indebtedness for which the note was given, upon which said judgment was recovered, was due and owing from said Charles Gordon to Margaret McGhie, for money loaned by her to him in December, 1874, and the balance of $1850 was obtained by him of her between the year 1877 and the date of the note, which was January 15, 1883, and that the note was indorsed and delivered by said Margaret McGhie to appellee, before its maturity. There are other allegations made, and discovery sought, such as are usually inserted in a creditor's bill proper; but defendants' oath being waived, and this not being technically a creditor's bill, they need not be further noticed. Prayer that said pretended conveyance be set aside, and said real and personal estate subjected to the payment of said judgment, and for such other relief as the nature of the case may require. The bill was sworn to. A demurrer was filed by William and Mary Gordon, which was overruled, and on April 30, 1883, they filed their answer, alleging that William Gordon purchased the property of his father, Charles Gordon, and paid him therefor $997.67, and denied the other averments in the bill, substantially, and claimed that appellee is only nominally the complainant, and that Charles Gordon is the real complainant, and that they are conspiring to deprive William and Mary Gordon of the property. On the 1st of December, A. D. 1883, appellee filed a supplemental bill, stating that on the 16th of August, 1876, Charles Gordon was indebted to one Elizabeth Martin, in about $200, for which, on the 19th of December, 1876, she brought suit before a justice, recovered judgment, filed a transcript thereof in the circuit court, and caused execution to issue, and the lot in controversy levied upon and sold, and bid in by her, and not being redeemed from, she obtained a deed, and since the filing of the original bill,—to-wit, November 23, 1883,— has conveyed the premises to appellee; that long prior to

August 16, 1876, Charles Gordon was the owner in fee of the premises, the same not being a homestead, and that on that day Charles conveyed the same to William for a pretended consideration of $500, which was never paid; that the same was made fraudulently, to hinder and delay creditors; that the property was worth $2500; that William has collected $1800 in rents from the premises, and that the consideration pretended to have been paid was grossly inadequate, and if William ever paid anything, he has been more than repaid in rents. Prayer that the conveyance to William be declared fraudulent and void, and appellee be decreed the owner, and for general relief. A demurrer to this supplemental bill having been overruled, the appellants, William and Mary Gordon, filed their answer, denying the indebtedness from Charles Gordon to Martin, and alleging that there was a conspiracy between them and appellee to deprive appellants of the premises; that Martin and Charles Gordon had each filed a bill to set aside the deed from Charles to William, both of which had been dismissed,—one after a demurrer had been sustained to it, and the other for want of prosecution. William and Mary also filed a cross-bill setting up the same facts, and that they have made valuable improvements, and expended large sums for taxes and repairs, but ask no relief on that account. They pray that the judgment, transcript and sheriff's deed be canceled and set aside. An answer and replication were filed, and on a hearing a decree was rendered, declaring the transfer from Charles Gordon to William Gordon, both as to the lot and the personal estate, void and of no effect as to appellee, and dismissing appellants' cross-bill for want of equity.

The appellants have arranged the errors complained of, under five heads, in their brief: First, in overruling demurrer to the original bill; second, in overruling demurrer to the supplemental bill; third, in allowing appellee (complainant below) to state, as they say, one case in his pleadings and to

present a different one in his evidence; fourth, in excluding proper evidence offered in behalf of appellants; and fifth, in not dismissing the bill for want of equity.

The appellants not standing by their demurrers, but answering over, must be considered as having waived them, except so far as he may have the same advantage, in substance, on the final hearing, in case complainant (upon his whole case, pleadings and proof considered,) is not entitled to the relief sought.

Under the third objection it is insisted the court erred in allowing appellee to amend his original bill after the evidence was substantially all heard, so that the allegations and proof might correspond. This was not only not error, but is a practice highly commendable, and absolutely necessary in a great many cases to a proper administration of justice. We fully recognize the rule contended for by counsel for appellants, that a complainant can not make one case by his pleadings and another by his evidence, and succeed. To obviate this he should do as was done in this case,—obtain leave to and amend his pleadings so as to fit the case shown by the evidence. It is not material when such amendments are made, except as to the terms the court, in its discretion, might see proper to impose as a condition to permitting the amendment. Usually these amendments are made after the evidence is all in, and the variance is brought out in the course of the argument, and it sometimes occurs that several amendments of this nature and for this purpose are made at different times during the final argument of the case. These amendments are purely discretionary, and ordinarily, in the absence of evidence showing an abuse of a reasonable discretion, are not subject to review. Rev. Stat. chap. 22, sec. 37; *Jefferson County* v. *Ferguson*, 13 Ill. 33; *Hewitt* v. *Dement*, 57 id. 500; *Booth* v. *Wiley et al.* 102 id. 84.

The court properly excluded the proffered proof by the sheriff, that Charles Gordon was "so anxious" to have a de-

mand made upon him for property to satisfy the execution that he went to the sheriff's office to enable the sheriff to make it. He could not, by his acts or in any other way, do anything to prejudice the rights of his creditor, and we do not see, even if Charles Gordon was anxious to have appellee make his judgment out of this property, that it showed any conspiracy to do so wrongfully.

It is said the court erred in refusing to allow Mary Gordon, the wife of William, to answer this question: "Do you know whether your husband (appellant William,) paid him (Charles) anything for the property?" Whether this ruling of the court was correct or not can not avail appellants, as they obtained the benefit of the testimony of Mary concerning that matter on her re-direct examination, in which she says: "I know that my husband paid Charles Gordon money for the place, because I know he had it to pay, and paid it; and after he paid it I had a conversation with Charles about his having received it, and he said he had received $220 from William when he bought the place." We do not see how Mary Gordon, the wife of William, could be a competent witness in his behalf in this case.

For the purpose of impeaching Charles Gordon, who had testified that he owed his daughter, Mrs. McGhie, $150 in 1874, he was asked by appellants' counsel if he did not go to her house in 1876 and claim of her that she owed him $100, and if a difficulty did not thereupon ensue between him and Mrs. McGhie and another daughter, (Susan Gordon,) and he go before a justice and swear out a warrant for their arrest, charging them with an assault with a deadly weapon,— which he denied, and appellants introduced several witnesses, whilst offering the testimony on their behalf, to contradict said Charles Gordon, and to show that he had stated, after his return from Mrs. McGhie, that she had assaulted him and turned him out of doors, and said, "that is what I get for my $100." After the appellants had introduced all their evidence, and

closed the case on their part, and appellee was offering his evidence in rebuttal, and for that purpose had recalled and examined said Charles Gordon about other matters not relating in any way to his visit to Mrs. McGhie, or with his complaint against her, or her arrest, the counsel for appellants, after cross-examining about other matters, showed him the complaint, for the purpose of identifying his signature to it, which he did, and he, after reading the complaint, said that it was not correct, and counsel then offered in evidence the warrant issued by the justice for the arrest of Susan Gordon and Margaret McGhie, on the charge contained in the complaint, with the return of the officer showing their arrest,— whereupon the court refused to allow the record to be introduced at that stage of the case, and said it should have been offered before, and in thus ruling appellants insist there was error. As a general rule we think the better practice in chancery cases is to admit evidence, subject to such objections as may be taken to it, till the final hearing, when the court will disregard it, if incompetent, or if not, give such weight to it as it may be entitled to; and it is not necessary for the court, in its decree, to pass upon these questions, the presumption being that it considered all competent and relevant testimony, and none other. As to this particular evidence, it having been offered by appellants after they had closed their case, it was discretionary with the court whether it would receive it or not, and its decision in that respect can not be reviewed. But even if it was wrongfully excluded, it is not of that vital character which would necessitate a reversal of the case on that account.

The last objection of appellants, that the court erred in not dismissing the case for want of equity, brings the whole case before us for consideration.

It will be observed from the pleadings in the case, that appellants, neither in their answer nor cross-bill, have alleged that the premises in controversy, either when conveyed to

William, or at the time of the rendition of the judgments, or at any time, were the homestead of Charles Gordon, the vendor and judgment debtor; nor do they set up and claim the protection of any statute of limitations, or allege such a state of facts, if they existed, (and we do not intend to intimate that they did exist,) as would authorize the successful pleading of that statute; nor do they ask for any account or allowance for improvements claimed to have been made, or for taxes paid; neither do they invoke the benefit of that section of our Statute of Frauds and Perjuries which provides that "all declarations or creations of trust or confidences of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party who is by law enabled to declare such trust, or by his last will, in writing, or else they shall be utterly void and of no effect." It is too familiar law to require any citation of authorities, that this last statute can not be relied upon as a defence in any case, unless insisted upon by plea or answer. Without it is thus interposed, a trust resting in parol will be enforced the same as though it was in writing. Had William Gordon, when he received this deed, executed and given to his father a writing declaring that the conveyance of the lot to him was made and was to be held by him in trust for the use and benefit of his father, no one would question that the father, Charles Gordon, would have such an interest in the lot that it could be sold on execution against him, whether the debt upon which the judgment had been obtained had been contracted prior or subsequent to the conveyance. The statute not being set up as a defence, the lot would be, under the parol agreement, just as much subject to the grantor's debts, antecedent or subsequent, as though the agreement had been reduced to writing. But even if the statute had been insisted upon, the result would not have been different in this case, for the evidence, we think, establishes that a part of Mrs. McGhie's debt, as well as all of that of Mrs. Martin, was contracted prior to the conveyance in con-

troversy, and that the latter was made, by agreement between Charles Gordon and his son, William, with the purpose and intent, on the part of both, to defeat and hinder and delay Martin in the collection of her debt; that no consideration was paid for the pretended sale of the real or personal estate, and that there was a secret understanding between Charles and William Gordon that the latter should hold it for the use and benefit of the former, and reconvey it to him when requested, and if Charles did not require him to reconvey it he (William) should take care of him (Charles) and provide him with necessaries during his natural life, and have the property at his death. That such a sale is void both as to real and personal property, is well settled. (*Lukins* v. *Aird,* 6 Wall. 78; *Moore* v. *Wood,* 100 Ill. 451.) Even where the grantee pays a valuable consideration, yet if a part of the consideration is an undertaking and promise by the grantee to support and take care of the grantor, such an agreement renders the transfer void as to existing creditors of the grantor. This point was fully considered, and so held by this court, in *Moore* v. *Wood, supra.*

The distinction as to the rights of precedent and subsequent creditors seems to be this: if the grantor reserves no future use or benefit in the property, then the sale can be attacked only by a preëxisting creditor; but where the conveyance is merely colorable, and a secret trust and confidence exist for the benefit of the grantor, then the sale is void, both as to precedent and subsequent creditors. *Jones et al.* v. *King et al.* 86 Ill. 225.

It can serve no useful purpose to discuss the evidence in this case, at large. Very much of it is incompetent, and consists largely of declarations of Charles Gordon, after the conveyance, about immaterial matters, and none of which were admissible in evidence against appellee, except for the purpose of impeaching Gordon as his witness, and for that purpose only where his testimony related to matters material to the

issue, and not then unless his attention had been called to the time, place, and persons to whom he had made his supposed declarations, which in most instances was omitted to be done.

Charles Gordon testified that he was sixty-nine years of age, and a widower; that he had a difference with his late housekeeper about her wages, and about a claim she was making against him for money she claimed to have expended for him whilst he was sick; that he considered the claim exorbitant, and wished to avoid its payment; that he consulted his son, the appellant William, about it, and that the latter told him, "You make over this property to me, and when it is all settled you can take it back," and that he then said to William, "Well, if you choose to take care of me, and provide me with all the necessaries during my life, at my *death* you can have the property,—by so doing you can go in and live there now. He agreed to do so. Afterward we went to an attorney, and talked the thing over to him, and he (the attorney) wished to make the deed in consideration of $1000. I objected, and told him there was no money in the transaction,—that I did not want that. The attorney said, 'I can not make it legal without putting something in it,' so the lawyer says, 'We will put $500 in it.' I allowed it, and the attorney made out the deed. * * * The property was unincumbered. The house was full of personal property,—furniture, carpets, book-cases, books, and everything connected with the house. The building and lot were worth about $2500, and the personal property about $250, in 1876. I had previously made a written acknowledgment of my indebtedness to Mrs. Martin. I owed Mrs. McGhie $150 at that time. I had no other property." William soon after moved into the house, and claimed both the lot and personal property under this pretended purchase, and the evidence tends strongly to show that a few months afterward he committed a serious assault upon his father, and drove him from the place. The old man (Charles) swears his

son never paid him anything for the property, and that he was not owing William anything at the time.    Declarations made by William, on several occasions, are proven, tending to corroborate old Mr. Gordon's story, and inconsistent with the idea that William was a *bona fide* purchaser of the property for a valuable consideration ; but we need not notice them particularly, as we think the testimony of William, himself, as to how, and the amount, he claims to have paid for the property, stamps the transaction as fraudulent as to existing creditors.    Let it be borne in mind that there is no evidence tending to show that the real estate, and very little that the personal estate, was worth any less than the value ($2500 as to the lot, and $250 as to the personal property,) put upon it by Charles Gordon, in his testimony.    The fact that he did not remember exactly what he paid for the lot, and believed it was $600, but had put improvements upon it since, amounts to nothing without proof as to the time of purchase, whether it had risen in value since, and the value of the improvements placed upon it.    Had it been worth no more than about the sum appellant William claims to have been paid for it, we have no doubt he could and would have found plenty of witnesses in Chicago acquainted with the value of this property, to have proved it.

In their answer appellants claim the sum of $997.67 to have been paid in cash for the property.    This shows, if true, that for a sale between father and son, they were particular as to the exact amount, else the son might perhaps have been induced to pay $2.33 more, so as to have made it an even $1000.    They were evidently not so careful to ascertain the exact value of the personal property, for they seem to have made no inventory of that, or made even an estimate as to its worth, for the father puts it at $250, and the son at $60. But if the amount paid was $997.67, it was but a trifle over one-third its actual value.    When, however, we turn to the testimony of William, we find he there claims to have paid only

9—114 ILL.

$500, or less than one-fifth its value. He says: "I paid Charles Gordon $500 cash for the conveyance of the property in controversy to me,—$190 of it was money I loaned him in 1865, $90 was money I let him have in 1870, and when I bought the place I paid him $220 more." It will be observed that this $190 had been standing eight years prior to the conveyance, and, *prima facie,* was barred by the Statute of Limitations. But aside from that, even if we admit that the son bought the property and paid the $500 for it, as he claims, the consideration is so flagrantly inadequate that such a transaction between father and son will, as to existing creditors, be declared fraudulent, without other proof. But this payment is not only denied by Charles Gordon, absolutely, but there is considerable other evidence in the case tending to show that William could not have had the money, either at the time the deed was made, or in 1865 or 1870, when he claims to have loaned him the $190 and the $90. The peculiar and unusual circumstances under which he claims to have paid this $220, look, to say the least, very suspicious. Instead of waiting until the deed was made out by the notary, and then paying it, he says he had a previous arrangement with his father to meet him in the back room of a saloon in Chicago, and pay him there. He says: "I gave him $220 the day the deed was made out, in the rear room of a saloon run by a man of the name of Slater, on Randolph street. * * * We went in there to talk the matter over before we went to the notary's office. He came there by agreement to meet me that morning at a certain time. He came to my house the night before, and agreed to meet me at this place, and from there went to the notary's office. I paid him the $220 then, in the saloon, in bills. I got the money from my house." Why not have waited till the deed was made out before making the payment? But if it was to be paid before, why not have paid it at his own house, when his father was there, the evening before? It is most strange that they should have made an agreement

to meet in the back room of this saloon to pay the money over, instead of at the notary's office, where they both knew they had to go to have the deed made out. Charles Gordon not only denies all this, but denies ever having been in the saloon. As a further indication that it was not a purchase by William, but a mere contrivance to get the title in his name without any real bargain or consideration being paid, William says, in his testimony: "I had a talk with father of what the consideration of the conveyance by him to me was. He stated it was $500. He counted up these payments, moneys I had loaned him at different times, and before we went to the notary's office, and he told me it was $500."

It is claimed that the original bill ought not to be maintained, because, as appellants claim, Charles Gordon did not owe Mrs. McGhie the $150, part of the alleged consideration of the $2000 note, prior to the conveyance being made. Both Mrs. McGhie and Charles Gordon swear he did owe it to her before that time, and we can not say that appellants have so discredited them that we should disbelieve their testimony; besides, as we have attempted to show, in the attitude this case presents it is not material whether the indebtedness for which the note was given was contracted before or after the conveyance.

Appellants' counsel complains that the court should have found that the balance of the consideration of the $2000 note was for board, clothing, medicine, and small sums of money loaned to Charles Gordon by Mrs. McGhie, and claims there is no evidence to sustain that finding. In this he is in error, arising from an omission, we presume by the person who made the abstract of complainant's evidence, for we find, on examination of the record, that Mrs. McGhie says that the balance of the indebtedness included in this note "was for board, clothes and medicine, and for cash advanced from 1877 down to the date of this note."

There is no force in the objection that appellee did not pay Mrs. McGhie the face value of the note. Had she given it to him, it could not affect his rights to pursue the same remedies for its collection that she could have done. We see nothing in the evidence reflecting upon his private or professional character in this transaction.

The fact that appellee's bill was sworn to, is urged as a reason why the court erred in allowing it to be amended. Swearing to the bill in this case was wholly unnecessary. It was not a bill for an injunction, in which proceeding it is sworn to that it may be used not only as a bill, but also as an affidavit in procuring, as well as on motion to dissolve, the injunction. Not being required in this case, it was to be disregarded for any purpose.

It is, perhaps, proper to say that none of our limitation laws could have been successfully invoked in this case, even if set up by plea or answer, from the fact that the shortest time (seven years) creating a limitation for the protection of parties in possession of real estate had not elapsed between the time of the making of the deed to William Gordon and the commencement of this suit to set it aside; and, besides, there was wanting an essential element necessary to make that statute available, to-wit, good faith in the making of the deed.

Charles Gordon swears the deed was never delivered by him to William Gordon; but as that is not material in the view we take of the case, we have treated it as having been delivered. We reach the conclusion, therefore, that appellee is entitled to have the conveyance from Charles Gordon to William Gordon of the real and personal property set aside, by reason of the matters alleged in the original bill, as amended, and which the evidence sustains; and as the relief sought by the supplemental bill is the same, it is unnecessary to discuss the question raised as to the right to file it, or the equities presented by it. The deed to William Gordon being set aside,

the cross-bill of appellants, based upon their supposed interest in the premises arising from such conveyance, can not be maintained.

The decree of the court below must be affirmed.

*Decree affirmed.*