## Mary A. Coffey v. Thomas Coffey, Ex'r, etc.

1. PRACTICE—*Trial by Jury in Probate Matters.*—The Probate Court tries questions relating to the inventories and accounts of executors administrators and guardians in a summary manner, without the inter,

vention of a jury, and on appeal to the Circuit Court the same course is pursued.

2. CONTRACTS—*Competency of the Parties.*—Where the legality of a transaction is disputed on the ground that one of the parties was not competent mentally, the question is not whether he was of a sound and disposing mind and memory generally, but whether he had sufficient mind and memory to understand the particular business in which he was engaged.

3. EQUITY PRACTICE—*As to Incompetent Evidence.*—In chancery cases it is not error to permit incompetent evidence to be heard before a judge trying a case without a jury, subject to objection; and even if no ruling against it is made the court will be presumed to have acted upon the competent testimony in the record.

4. CORPORATIONS—*Blank Assignments of Stock.*—The possession of a stock certificate of a corporation on which is a printed assignment and power of attorney to do all acts necessary to transfer the shares represented by the certificate, signed in blank, *prima facie* authorizes the holder to so fill the blanks as to authorize him to cause the shares to be transferred to himself on the books of the company.

Petition in Probate. — Appeal from the Circuit Court of Peoria County; the Hon. THOMAS M. SHAW, Judge, presiding. Heard in this court at the December term, 1897. Affirmed. Opinion filed February 28, 1898.

STATEMENT OF THE CASE.

Peter Coffey died testate at Peoria, January 17, 1895, leaving appellant, his widow, and no lineal descendants. His will was duly admitted to probate and his brother, Thomas Coffey, the appellee, is the executor. The widow elected to take the share given her by law, and has already received $85,000 from the estate. She began this proceeding by filing a petition in the Probate Court to compel the executor to inventory and distribute 435 shares of the capital stock of the Peoria Gas Light and Coke Company, which she alleged Peter Coffey owned at the time of his death over and above the shares of said stock which the executor had inventoried. The executor answered, alleging he had inventoried all the personal property owned by Peter Coffey at the time of his death, and there was a hearing in the Probate Court and the petition was dismissed. Mrs. Coffey appealed to the Circuit Court and there moved to submit to a jury the questions, first, whether Peter Coffey, on Janu-

Coffey v. Coffey.

ary 7 and 8, 1895, was of a sound and disposing mind and memory; and, second, whether Thomas Coffey, the executor, wrongfully converted to his own use the 435 shares of stock in question. She supported the motion by an affidavit that the executor claimed testator gave him said shares January 7, 1895, and at the trial there would be a controversy as to whether testator did make such gift, and whether he was of sound mind and memory at that time. The Circuit Court denied said motion, and this action is assigned for error. There was a hearing in the Circuit Court and a final order adjudging that said shares were duly transferred upon the books of said gas company and delivered to Thomas Coffey by direction of Peter Coffey in his lifetime in accordance with a trust declared in writing by said Peter Coffey on June 4, 1887, and on that day accepted by said Thomas Coffey; and that Thomas Coffey takes and holds the legal title to said shares of stock in accordance with the provisions of said trust. From that order Mrs. Coffey prosecutes this further appeal.

On June 2, 1887, Peter Coffey executed the will which was probated after his death, by which will he gave legacies amounting to about $56,000, and directed the expenditure of certain sums for monuments and masses, and directed that if his estate was insufficient to pay these legacies they should share *pro rata*, and if it was more than sufficient to pay them, the legacies should be increased *pro rata* so as to absorb his entire estate. Two days later he executed a trust instrument. Each of said instruments was prepared by Judge Worthington and each is elaborate in detail, and it is claimed that each had its place in the disposition of his estate which he had then determined upon, the trust instrument to be a disposition in his lifetime of the special property described therein, and the will to be a disposition of all that should be left at his death. The trust instrument declares that Peter Coffey does hereby convey, transfer, assign and deliver to his brother Thomas the following shares of stock indorsed in blank, naming 335 shares of the gas company before mentioned, 200 shares of the Belleville Gas Light and Coke

Company, and ten shares of the Peoria Watch Company. It declares that said gift and conveyance is made upon the terms and conditions therein named, which are, among other things, that $15,000 of the proceeds of the stock if converted into money, or stock to that amount at its market value if he prefers, shall go and belong absolutely to said Thomas; and that the balance of said stock is conveyed to him in trust for the purposes specified, namely, first, $15,000 for the relief, education and maintenance of orphans of Catholic parents in the diocese of the Catholic Bishop of Peoria in such a way and manner as may be dictated by Bishop Spalding of said diocese, or his successor in office; $1,000 for the relief, education and maintenance of the orphans of Catholic parents of the diocese of the Catholic Bishop of St. Louis, Missouri, in such a way and manner as may be dictated by Bishop Kendrick of said diocese, or his successor in office; and $1,000 to be paid to the directors or managers of St. Mary's Infirmary at St. Louis, Missouri. Said instrument further provides that if the proceeds of the stock, after Thomas has received said $15,000, be insufficient to pay the amounts specified for charitable uses, said amounts for charitable uses shall be scaled down *pro rata*, and if there is any surplus after paying the $15,000 to Thomas, and said amounts for charitable uses, such surplus shall go absolutely to Thomas. The instrument directs that Thomas is to use his judgment and discretion about the time and manner of converting said stock into money, subject to this limitation of time: that said amounts for charitable uses are to be paid within five years of the date of the instrument; or that Thomas can hold and retain absolutely as his own all said stock if he pays said amounts for charitable uses within five years from the date of the instrument. Said instrument further provides that if Thomas declines or refuses to accept the trust then the conveyance is to be null and void and said stocks are to revert to Peter as his sole property, and if said Thomas shall accept and agree to enter upon the duties of said trust his acceptance is to be in writing indorsed upon the conveyance. At the foot of said

instrument was this acceptance signed by Thomas Coffey: "I hereby accept the within property and trust, this 4th day of June, 1887."

So far as shown by the evidence held competent below, Peter Coffey did not at that time place said shares of stock in the manual possession of Thomas, though long before January 7, 1895, Thomas had a key which enabled him to have access to the safety box where said certificates of stock were kept by Peter, and this possession by him gave him at least access to if not possession of these certificates of stock, and it may be that Peter placed said key in his hands expressly for the purpose of this trust. Peter and Thomas were intimately associated in their business affairs. Thomas was president of the Peoria Gas Light and Coke Company; Peter was its superintendent for over twenty years and until his death, and Mathew Farrelly, their cousin, and the one who made the transfer of the shares here in question, was secretary of the company. Each of the three was a director in the company. Thomas Coffey lived with Peter at the time of his death and for several months before, and Farrelly had lived with Peter for over twelve years and till a few months before he died. Peter had had a stomach trouble for some years and became seriously ill therefrom in November, 1894, and was confined to his house from about the middle of that month. His disease was supposed to be cancer of the stomach, and he suffered great pain which his physician tried to relieve by the use of laudanum. He had a severe hemorrhage of the stomach January 5, 1895, which left him very weak, and a slighter one several days days later. He died January 17, 1895. About November 19, 1894, he sold the Belleville stock described in said trust instrument.

Bishop Spalding was a friend of the deceased and called upon him four or five times during his last illness. He called on a day which all the evidence taken together shows was January 7, 1895, two days after the serious hemorrhage, and at a time when Peter must have realized that his illness was of a very serious character. Peter asked the Bishop if

Thomas had shown him the will and trust instrument. The Bishop answered in the negative, and Peter said, "He is in the house; go and tell him to show them to you." The Bishop went to another room and saw Thomas, and the latter showed him said papers, and he read them. The Bishop returned to the sick room and Peter asked if Thomas had shown him the documents. The Bishop replied that he had, but that the limitation of the time of the trust instrument had caused it to have no legal value. The Bishop referred to the provision requiring the amounts for charitable uses to be paid within five years of the date of the instrument. Peter seemed provoked, and said if his brother had attended to it at the proper time it would have been all right, but it was too late now to attend to it, meaning, as the Bishop understood him, that he was too ill then to attend to the preparation of a new document. He, however, told the Bishop he wanted that request carried out, and said he had left something for charity for the orphans of Metamora, pointing at the same time in the direction of some local institution. Just after the Bishop left Peter he met Farrelly and told him what Peter had said. Somewhere about this date, but the precise time is not fixed, Thomas Coffey had called upon W. S. Horton, an attorney, with the trust instrument, and the latter examined it and carried it back to the house of Peter Coffey and handed it to Farrelly, who met him at the door. About 7 P. M. of January 7th, and after the Bishop's visit, Farrelly told Thomas that Horton had called to see him and that he had better go to Horton's house. Thomas went away for that purpose and came back about 10 P. M. (the precise time not being stated by any witness) and went up stairs and saw Peter, and then came down stairs and handed Farrelly the trust instrument and told him to read it, which Farrelly did. Then Thomas told Farrelly that Horton said the stock should be transferred and delivered during the lifetime of Peter Coffey, and that he had reported this to Peter and the latter wanted Farrelly to go up and see him. Farrelly then went up stairs and asked Peter if it was his will and wish that he, Farrelly,

.should transfer to Thomas so many shares (naming the number of shares) of gas stock as named in and in accordance with the document Thomas had just shown him down stairs, which bore Peter's signature, and Peter said, "Yes, it is." Farrelly then reminded Peter that the Belleville stock had recently been sold, and asked him if he should make up enough of his other shares to offset the Belleville stock so sold, and Peter told him "yes." Peter, of his own accord, also told Farrelly of a request he had made of Thomas about the future care of Farrelly's sister. Farrelly then went down stairs and told Thomas of the conversation, and they arranged to have the shares transferred on the books of the company at the gas office the next morning. The next morning, January 8th, Thomas Coffey brought to the gas office certificates for 447 shares of said gas stock standing in the name of Peter Coffey and bearing Peter's indorsement in blank on the back in Peter's handwriting; and Farrelly transferred 435 of these shares to Thomas and issued a certificate thereof to him, and issued a new certificate to Peter for the remaining twelve shares. About 2 p. m. that day Farrelly went to Peter and told him what he had done, that he had transferred these shares to Thomas, and had put in the one hundred shares to take the place of the Belleville stock that was sold, making in all 435 shares transferred, and he asked Peter if that was perfectly satisfactory and all right, and Peter replied "Yes, that is all right; anything you have done is all right." Farrelly elsewhere testified Peter told him to transfer to Thomas the 335 shares and additional shares to make up for the Belleville stock that was sold, but that he did not that night say how many shares should be used to make up for the Belleville stock, and that it was Thomas the next morning who first said that one hundred shares of other stock should be the number of shares to be substituted for the Belleville stock. In still another connection Farrelly testified that he was ordered to make this transfer by Peter Coffey.

While this suit was pending Thomas filed another written acceptance of the trust, covering the 435 shares.

FOSTER & CARLOCK, attorneys for appellant.

Over a certain class of subjects, including the one in controversy in this case, the Probate Court has unlimited jurisdiction, and within that sphere, is in all respects equal to the Circuit Court. Martin v. Martin, 68 Ill. App. 169; Winslow v. Leland et al., 128 Ill. 340; Howell v. Moores, 127 Ill. 79; Shepard v. Speer, 140 Ill. 245; Moffitt et al. v. Moffit, 69 Ill. 644; Propst v. Meadows, 13 Ill. 168.

The Probate Court has the right to inquire whether or not a fraud has been practiced. Winslow v. Leland, 128 Ill. 340; Marston v. Wilcox, 1 Scam. 60; Willenborg et al. v. Murphy, Adm'r, 36 Ill. 344.

Undoubtedly, the court has the power to discover assets in the hands of an executor, or any other person, to determine what are assets of the estate, and to compel the executor to inventory and account for the same. Steinman v. Steinman, Adm'x, 105 Ill. 348; Martin v. Martin, 68 Ill. App. 169; Williams v. Chamberlain, 165 Ill. 212; Blair v. Sennott, 134 Ill. 86; Booth v. Tabbernor, 23 Ill. App. 173; Ralston et al. v. Wood, 15 Ill. 169; 1 Woerner Am. Law of Adm., Sec. 154, p. 349, and cases cited.

And hence the court has the power to try title, or pass upon the validity of an alleged gift. 1 Woerner Am. Law of Adm., Sec. 154, p. 349 and cases cited.

The court ought to proceed as though a bill in chancery had been filed; having the right and discretion to submit issues of fact to a jury as in other chancery cases. Heward v. Slagle et al., 52 Ill. 336; In re William Steele, 65 Ill. 322.

Upon the question of Peter Coffey's sanity, the motion to submit that issue of fact to a jury was addressed to the sound discretion of the court. It was not only proper to be tried by a jury, under the statute, but such is much the better practice, and the course adopted by the courts of this State, whenever requested by proper motion. R. S., Chap. 22, Sec. 40; Myatt v. Walker, 44 Ill. 485; Guild et al. v. Hull et al., 127 Ill. 531; Brown et al. v. Miner et al., 128 Ill. 154; Coutant v. Schuyler et al., 1 Paige, 316; Ward v. Turner, 2 Ves. Sr. 437.

Coffey v. Coffey.

The second issue of fact asked to be submitted to a jury involves the question of conversion, and whether Thomas Coffey is guilty of such conversion is a question of fact for the jury. Only the ultimate fact should be submitted for trial. Leman v. Best, 30 Ill. App. 323; Kime v. Dale, 14 Ill. App. 308; 2 Elliott's Gen'l Prac., Sec. 931; Wade v. Pritchard, 69 Ill. 279.

Trover is the proper remedy to recover shares of stock wrongfully converted. Smith's Leading Cases, 642–645; Hayes et al. v. Mass. L. Ins. Co., 125 Ill. 633.

This proceeding is summary and equitable, but the fact to be found is conversion, which is triable by jury at common law. And in such cases, the right of trial by jury is guaranteed by the constitution. Const. 1818, Art. 8, Sec. 6; Const. 1848, Art. 13, Sec. 6; Const. 1870, Art. 2, Secs. 2 and 5; Bullock v. Geomble, 45 Ill. 218; Gage v. Ewing, 107 Ill. 11.

It is not in the power of the legislature to defeat the right of trial by jury where a remedy existed at common law, by simply declaring that cases may be tried in courts of chancery. Ward v. Farwell et al., 97 Ill. 613; Cooley's Const. Lim. (6 Ed.), 505; Norris's Appeal, 64 Pa. St. 275; 3d Am. & Eng. Ency. of Law, 722; Davis v. Settle, 26 S. E. Rep. (West Va.) 557.

But the constitutional provisions are satisfied if the controverted facts are submitted to a jury. Gage v. Ewing, 107 Ill. 11; Charles River Bridge v. Warren Bridge, 7 Pick. (Mass.) 366; Smith's Adm'r v. Smith, 2 Miss. (1 Howard) 102; Hoitt v. Burleigh, 18 N. H. 389.

Where the terms of the gift are expressed in a written instrument not under seal, there must be an actual delivery of not only the writing itself, but also the personalty named in it; otherwise the gift fails. Wadd v. Hazelton, 21 L. R. A. 693 and valuable notes; McGrath v. Reynolds, 116 Mass. 568; Smith v. Downey, 3 Ired. Eq. (N. Car.) 276; Taylor v. Taylor, 2 Humph. (Tenn.) 597; Payne v. Powell, 5 Bush. (Ky.) 251; Reid v. Butt, Adm'r, 25 Ga. 33; Re Shield, 53 L. T. (N. S.) 5.

Generally, possession is *prima facie* evidence of title, but such is not the rule in a case like this, where the property is shown to have been a part of the testator's estate. Martin v. Martin, 68 Ill. App. 169; Resch v. Senn, 28 Wis. 291.

In all cases the presumption of law is against the gift. It must be established beyond suspicion. 2 Rice on Evidence, Sec. 383, p. 990, and cases cited; Conklin v. Conklin, 20 Hun, 278; Antrobus v. Smith, 12 Ves. 44.

The law requires the same capacity to make a gift of the property in controversy, as it would to dispose of it by will. The rule is, that one must have sufficient mind and memory to understand the particular business in which he is presently engaged, to recall to mind the natural objects of his bounty, the property to be disposed of, its nature and extent, and to make disposition of it understandingly, according to some definite purpose or plan formed in his mind. 1 Woerner Am. Law. Admr., Sec. 59, p. 117; Craig et al. v. Southard et al., 148 Ill. 45; Sinnet et al. v. Bowman et al., 151 Ill. 155; Perry v. Pearson et al., 135 Ill. 224; Guild et al. v. Hull, 127 Ill. 534.

STEVENS, HORTON & ABBOTT, attorneys for appellee.

MR. JUSTICE DIBELL DELIVERED THE OPINION OF THE COURT.

We are of opinion appellant was not entitled to a jury trial. We regard that question as settled for proceedings of this character by Martin v. Martin, 170 Ill. 18. In that case, as in this, a party entitled to share in the estate applied to the Probate Court to compel the executors to inventory personalty which one of them claimed to own. That case holds that the proceeding is an equitable one; that the practice act and its provisions for jury trials and for propositions of law where juries are waived does not apply. The Probate Court tries questions relating to the inventories and accounts of executors, administrators and guardians, in a summary manner and without a jury. Maynard v. Richards, 166 Ill. 466. Appellant herself

invoked the exercise of this summary jurisdiction.   There are other reasons why the refusal of appellant's motion was not error.   The second question proposed for the jury was one which there can be no reasonable claim appellant had a right to have so submitted in a proceeding begun by her in the Probate Court.   The first question proposed, that is, whether Peter Coffey on January 7 and 8, 1895, was of a sound and disposing mind and memory, did not present the question which was in fact in controversy.   Even if the executor had claimed Peter made a gift of these shares to him on January 7 and 8, 1895, still the true issue could not be whether Peter was generally of a sound and disposing mind and memory at that date, but whether he had sufficient mind and memory to understand the particular business in which he was then engaged in giving said shares to Thomas.   But the claim of the executor was that on June 4, 1887, two days after he made the will which was probated, Peter executed a trust instrument making Thomas a trustee of certain shares of stock (being substantially those now in question), for certain purposes in said instrument set forth, and that Thomas on that day accepted said trust in writing; and that on January 7 and 8, 1895, said Peter Coffey completed the erection of the trust by directing and causing said shares, or other shares in their place, to be transferred to Thomas on the books of the gas company.   Manifestly the completion of an arrangement made in writing seven and a half years before by directing or authorizing a transfer on the company's books of shares to the trustee so previously appointed, and upon trusts so previously fixed, was a transaction which might call for the exercise of much less memory and mental exertion than the making of a new disposition of said shares at the later date. If Peter's direction to transfer the shares was vital to the validity of the title by which Thomas now claims to hold them in trust, then the true question was whether Peter Coffey, on January 7 and 8, 1895, had sufficient mind and memory to complete the trust arrangement (which had been put in writing by him with all detail in 1887), by

authorizing the transfer of shares on the books of the company. The question appellant asked the Circuit Court to submit to a jury did not fairly present the true issue to be determined, and a negative answer to it would not necessarily have been decisive of the true issue. She can not assign for error that some other issue than that she requested should have been submitted to a jury.

Thomas Coffey was offered as a witness in his own behalf in the Circuit Court, and appellant denied his competency. The trial judge heard his evidence subject to objection and afterward excluded it. In chancery cases it is not error to permit incompetent evidence to be heard before the judge without a jury subject to objection; and even if no ruling against it is made the court will be presumed to have acted upon the competent testimony in the record. Gordon v. Reynolds, 114 Ill. 118; Peabody v. Kendall, 145 Ill. 519. This being the rule, there can be no error in such a case as this in letting in the incompetent evidence, where it is afterward excluded. We proceed to consider the case as if the evidence of Thomas Coffey was not in the record.

It is claimed by appellant that Peter Coffey was not in a mental condition to transact business at that time. His physician testified he did not consider him competent to transact business during the last two weeks of his life. Certain sisters from the hospitals who nursed him, and a couple of other witnesses were of the same opinion, and two of them testified he sometimes seemed to have hallucinations, though this had not been observed by other nurses. The physician stated however, that Peter had no mental disease, and it is evident from the testimony of the nurses that the only defects they noticed (other than the hallucinations just referred to) were extreme weakness and the results of the laudanum. That drug produced lethargy and drowsiness about fifteen minutes after it was administered, and the effect lasted one and a half or two hours. The doctor gave the nurses a written schedule by which to administer nourishment and the laudanum and other remedies, and it shows that laudanum was to be given at 10 A. M. and 10 P. M.,

"seventeen drops when no pain; thirty to thirty-five drops if pain." The proof shows laudanum was sometimes given at other times and in still larger doses if the patient was in extreme pain, but there is no proof that the patient was under the influence of that drug anywhere near all the time. The nurses and others testifying for appellant each related, on cross-examination, things Peter Coffey said during the last two or three weeks of his life, which showed him in possession of reason and intelligence. The sisters usually went out of the room when any one was there to talk with him, and if they remained in the room did not attend to the conversation, and hence could not state the nature and extent of such conversations and his participation in them. On the other hand, the Bishop and the business friends and acquaintances of the deceased called upon him at different times during that period and conversed with him and found him very sick and very weak but intelligent and rational, and all believed him competent to understand and transact business. It is to be noted that Farrelly, the most important witness for appellee, testified against his own interest, as the will of the deceased not only gave him $5,000 but also provided that the excess of Peter's estate which might be left after satisfying the legacies therein named, amounting to about $56,000, should be divided *pro rata* among the legatees. No one testified Peter was under the influence of opiates at the time when he transacted this business on January 7th and 8th. We have carefully considered the evidence bearing upon his mental condition at that time and think it justifies the conclusion that he was competent to transact that business. We see no reason to doubt that he wished this last step taken so that his trust arrangement might be carried out and perfected during his lifetime, and that he intelligently comprehended and approved of what was done. This was not a new scheme then devised by him during his last sickness, but the doing of a merely formal and perhaps unnecessary act to more effectually carry out that which he had provided in minute detail when he was in health.

As to the 335 shares, it is by no means certain the deed of trust or conveyance would fail if it was found Peter was mentally unable on January 7th and 8th to direct and approve of a transfer on the books of the company. Thomas presented the certificates for those shares at the gas company's office January 8th for transfer, and they had at some previous time been indorsed in blank by Peter Coffey and come into the manual possession of Thomas. If Thomas is not a competent witness to show when and how he received these certificates so indorsed he is entitled to the presumption that they were properly and lawfully in his hands in that condition till the contrary appears. There is no presumption that he came by them improperly. For aught we can know, outside his testimony, Peter may have personally placed them in his hands or given him the key to the box where they were long before, and expressly for the purposes of the trust, and if so we do not doubt he would be entitled to hold them though not transferred on the books. Moreover, on the back of each certificate was a printed assignment and power of attorney to do all acts necessary to transfer said shares required by the by-laws of said company. The places for names and dates were blank. Each was signed by Peter Coffey. Thomas Coffey's possession of these certificates so indorsed *prima facie* authorized him to so fill the blanks as to make them assignments to himself and to cause them to be transferred to himself upon the books of the company, and this without any oral directions from or further action by Peter Coffey. We are unable to see that appellant rebutted the *prima facie* case made by the fact that Thomas Coffey produced these shares at the gas office so indorsed by Peter Coffey.

The conclusions already stated make it unnecessary for us to decide whether Thomas was a competent witness. So far as the charitable beneficiaries in said deed of trust are concerned he would be a competent witness for them if their interest could be separated from his. If his testimony was competent it removes every shadow of suspicion cast upon the case and shows clearly the purpose and previous

efforts of the deceased to have his trust arrangement per-fected during his life beyond all possible attack.

We do not regard this as a *donatio causa mortis* but as a gift *inter vivos* carried into complete execution during the lifetime of Peter Coffey and conveying entirely beyond his reach the property in question, so that if he had recovered from the illness from which he was suffering when he took the last steps to perfect the arrangement he could not have recalled the property so given away. Therefore the question whether the rights of a widow can be defeated by a gift *causa mortis*, though argued, we consider is not raised by this record.

The order of the court below is affirmed.