## MARY A. COFFEY

*v.*

## THOMAS COFFEY, EXR.

*Opinion filed April 17, 1899.*

1. TRIAL—*jury trial cannot be insisted upon in probate proceedings.* A proceeding begun in the probate court by one interested in an estate, to compel an executor to inventory certain personal property claimed by the executor, is an equitable one invoking the summary jurisdiction of the court, and the complaining party can not insist on a jury trial on appeal to the circuit court.

2. SAME—*right of court to hear incompetent evidence in chancery case.* In chancery cases tried without a jury it is not error for the court to admit incompetent evidence subject to objection; and even where no ruling against it is made it will be presumed, on appeal, that the court acted only upon the competent evidence.

3. MENTAL CAPACITY—*test of mental capacity to transfer shares of stock.* Where the transfer of shares of stock by the owner during his last illness is claimed to be invalid on the ground of the owner's mental incapacity, the issue presented is not whether he was generally of sound and disposing mind and memory, but whether he had sufficient mind and memory to understand the particular business upon which he was engaged.

4. CORPORATIONS—*presumption of ownership from possession of stock assigned in blank.* The holder of a certificate of stock on which is a printed assignment and power of attorney to make the transfer, signed by the owner, is presumed to be rightfully in possession thereof, and is *prima facie* authorized to fill in the blank assignment and cause a transfer to be made to himself on the books.

5. EVIDENCE—*presumption of ownership from possession arises though witness is incompetent.* In a proceeding by heirs to compel an executor to inventory shares of stock claimed by him as his own, the fact that he held the stock assigned in blank before the death of the owner raises a presumption of ownership in him which must be overcome before his *prima facie* title will be divested, even though he were held incompetent to testify when and how he got possession.

6. GIFTS—*when gift is inter vivos and not causa mortis.* A transfer of shares of stock during the owner's last sickness in order to carry out the terms of an instrument of trust executed years before, by which such stock was conveyed in trust to the assignee in consideration of certain obligations therein imposed, is a gift *inter vivos* and not a *donatio causa mortis.*

*Coffey* v. *Coffey*, 74 Ill. App. 241, affirmed.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Peoria county; the Hon. T. M. SHAW, Judge, presiding.

The Appellate Court, in deciding this case, has prefaced its opinion with the following statement of facts:

"Peter Coffey died testate at Peoria January 17, 1895, leaving appellant, his widow, and no lineal descendants. His will was duly admitted to probate, and his brother, Thomas Coffey, the appellee, is the executor. The widow elected to take the share given her by law, and has already received $85,000 from the estate. She began this proceeding by filing a petition in the probate court to compel the executor to inventory and distribute 435 shares of the capital stock of the Peoria Gas Light and Coke Company, which she alleged Peter Coffey owned at the time of his death over and above the shares of said stock which the executor had inventoried. The executor answered, alleging he had inventoried all the personal property owned by Peter Coffey at the time of his death, and there was a hearing in the probate court and the petition was dismissed. Mrs. Coffey appealed to the circuit court, and there moved to submit to a jury the questions, first, whether Peter Coffey, on January 7 and 8, 1895, was of a sound and disposing mind and memory; and second, whether Thomas Coffey, the executor, wrongfully converted to his own use the 435 shares of stock in question. She supported the motion by an affidavit that the executor claimed testator gave him said shares January 7, 1895, and that at the trial there would be a controversy as to whether testator did make such gift, and whether he was of sound mind and memory at that time. The circuit court denied said motion, and this action is assigned for error. There was a hearing in the circuit court, and a final order adjudging that said shares were duly transferred upon the books of said gas company and delivered

to Thomas Coffey by direction of Peter Coffey in his life-time, in accordance with a trust declared in writing by said Peter Coffey on June 4, 1887, and on that day accepted by said Thomas Coffey, and that Thomas Coffey takes and holds the legal title to said shares of stock in accordance with the provisions of said trust. From that order Mrs. Coffey prosecutes this further appeal.

"On June 2, 1887, Peter Coffey executed the will which was probated after his death, by which will he gave legacies amounting to about $56,000, and directed the expenditures of certain sums for monuments and masses, and directed that if his estate was insufficient to pay these legacies they should share *pro rata*, and if it was more than sufficient to pay them the legacies should be increased *pro rata* so as to absorb his entire estate. Two days later he executed a trust instrument. Each of said instruments was prepared by Judge Worthington and each is elaborate in detail, and it is claimed that each had its place in the disposition of his estate which he had then determined upon, the trust instrument to be a disposition in his lifetime of the special property described therein, and the will to be a disposition of all that should be left at his death. The trust instrument declares that Peter Coffey does hereby convey, transfer, assign and deliver to his brother, Thomas, the following shares of stock endorsed in blank, naming 335 shares of the gas company before mentioned, 200 shares of the Belleville Gas Light and Coke Company, and 10 shares of the Peoria Watch Company. It declares that said gift and conveyance is made upon the terms and conditions therein named, which are, among other things, that $15,000 of the proceeds of the stock if converted into money, or stock to that amount at its market value if he prefers, shall go and belong absolutely to said Thomas, and that the balance of said stock is conveyed to him in trust for the purposes specified, namely: First, $15,000 for the relief, education and maintenance of orphans of catholic

parents in the diocese of the catholic bishop of Peoria in such way and manner as may be dictated by Bishop Spalding of said diocese, or his successor in office; $1000 for the relief, education and maintenance of the orphans of catholic parents of the diocese of the catholic bishop of St. Louis, Missouri, in such way and manner as may be dictated by Bishop Kendrick of said diocese, or his successor in office; and $1000 to be paid to the directors or managers of St. Mary's Infirmary at St. Louis, Missouri. Said instrument further provides that if the proceeds of the stock after Thomas has received said $15,000 be insufficient to pay the amounts specified for charitable uses, said amounts for charitable uses shall be scaled down *pro rata,* and if there is any surplus after paying the $15,000 to Thomas and said amounts for charitable uses, such surplus shall go absolutely to Thomas. The instrument directs that Thomas is to use his judgment and discretion about the time and manner of converting said stock into money, subject to this limitation of time: that the said amounts for charitable uses are to be paid within five years of the date of the instrument; or that Thomas can hold and retain absolutely as his own all said stock if he pays said amounts for charitable purposes within five years from the date of the instrument. Said instrument further provides that if Thomas declines or refuses to accept the trust, then the conveyance is to be null and void and said stocks are to revert to Peter as his sole property, and if said Thomas shall accept and agree to enter upon the duties of said trust, his acceptance is to be in writing, endorsed upon the conveyance. At the foot of said instrument was this acceptance, signed by Thomas Coffey: 'I hereby accept the within property and trust this 4th day of June, 1887.'·

"So far as shown by the evidence held competent below, Peter Coffey did not, at that time, place said shares of stock in the manual possession of Thomas, though long before January 7, 1895, Thomas had a key which enabled

him to have access to the safety-box where said certifi-
cates of stock were kept by Peter; and this possession
by him gave him at least access to, if not possession
of, these certificates of stock, and it may be that Peter
placed said key in his hands expressly for the purpose
of this trust.  Peter and Thomas were intimately associ-
ated in their business affairs.  Thomas was president of
the Peoria Gas Light and Coke Company; Peter was its
superintendent for over twenty years and until his death,
and Matthew Farrelly, their cousin, and the one who made
the transfer of the shares here in question, was secre-
tary of the company.  Each of the three was a director
in the company.  Thomas Coffey lived with Peter at the
time of his death and for several months before, and
Farrelly had lived with Peter for over twelve years and
till a few months before he died.  Peter had had a stomach
trouble for some years, and became seriously ill there-
from in November, 1894, and was confined to his home
from about the middle of the month.  His disease was sup-
posed to be cancer of the stomach, and he suffered great
pain, which his physician tried to relieve by the use of
laudanum.  He had a severe hemorrhage of the stomach
January 5, 1895, which left him very weak, and a slighter
one several days later.  He died January 17, 1895.  About
November 19, 1894, he sold the Belleville stock described
in said trust instrument.

"Bishop Spalding was a friend of the deceased, and
called upon him four or five times during his last illness.·
He called on a day which all the evidence taken together
shows was January 7, 1895,—two days after the serious
hemorrhage, and at a time when Peter must have realized
that his illness was of a very serious character.  Peter
asked the bishop if Thomas had shown him the will and
trust instrument.  The bishop answered in the negative,
and Peter said:  'He is in the house; go and tell him to
show them to you.'  The bishop went to another room
and saw Thomas, and the latter showed him said papers

and he read them. The bishop returned to the sick room, and Peter asked if Thomas had shown him the documents. The bishop replied that he had, but that the limitation of the time of the trust instrument had caused it to be of no legal value. The bishop referred to the provision requiring the amounts for charitable uses to be paid within five years of the date of the instrument. Peter seemed provoked, and said if his brother had attended to it at the proper time it would have been all right but it was too late now to attend to it,—meaning, as the bishop understood him, that he was too ill then to attend to the preparation of a new document. He, however, told the bishop he wanted that request carried out, and said he had left something for charity for the orphans of Metamora, pointing at the same time in the direction of some local institution. Just after the bishop left Peter, he met Farrelly and told him what Peter had said.

"Somewhere about this date, but the exact time is not fixed, Thomas Coffey had called upon W. S. Horton, an attorney, with the trust instrument, and the latter examined it and carried it back to the house of Peter Coffey and handed it to Farrelly, who met him at the door. About 7 P. M. of January 7, and after the bishop's visit, Farrelly told Thomas that Horton had called to see him and that he had better go to Horton's house. Thomas went away for that purpose and came back about 10 P. M., (the precise time not being stated by any witness,) and went up-stairs and saw Peter, and then came down-stairs and handed Farrelly the trust instrument and told him to read it, which Farrelly did. Then Thomas told Farrelly that Horton said the stock should be transferred and delivered during the lifetime of Peter Coffey, and that he had reported this to Peter and the latter wanted Farrelly to go up and see him. Farrelly went up-stairs and asked Peter if it was his will and wish that he, Farrelly, should transfer to Thomas so many shares (naming the number of shares) of gas stock as named in and in accordance

with the document Thomas had just shown him down stairs, which bore Peter's signature, and Peter said, 'Yes, it is.' Farrelly then reminded Peter that the Belleville stock had recently been sold, and asked him if he should make up enough of his other shares to offset the Belleville stock so sold, and Peter told him 'yes.' Peter of his own accord also told Farrelly of a request he had made of Thomas about the future care of Farrelly's sister. Farrelly then went down-stairs and told Thomas of the conversation and they arranged to have the shares transferred on the books of the company at the gas office the next morning. The next morning, January 8, Thomas Coffey brought to the gas office certificates for 447 shares of said gas stock standing in the name of Peter Coffey and bearing Peter's endorsement in blank on the back in Peter's handwriting and Farrelly transferred 435 of these shares to Thomas and issued a certificate thereof to him, and issued a new certificate to Peter for the remaining 12 shares. About 2 P. M. of that day Farrelly went to Peter and told him what he had done,—that he had transferred those shares to Thomas and had put in the 100 shares to take the place of the Belleville stock that was sold, making in all 435 shares transferred, and he asked Peter if it was perfectly satisfactory and all right, and Peter replied: 'Yes, that is all right; anything you have done is all right.' Farrelly elsewhere testified Peter told him to transfer to Thomas the 335 shares and additional shares to make up for the Belleville stock that was sold, but that he did not that night say how many shares should be used to make up for the Belleville stock, and that it was Thomas the next morning who first said that 100 shares of other stock should be the number of shares to be substituted for the Belleville stock. In still another connection Farrelly testified that he was ordered to make this transfer by Peter Coffey.

"While this suit was pending Thomas filed another written acceptance of the trust, covering the 435 shares."

FOSTER & CARLOCK, for appellant.

STEVENS, HORTON & ABBOTT, for appellee.

Per CURIAM: The opinion of the Appellate Court, as delivered by Mr. Justice DIBELL, is as follows:

"We are of opinion appellant was not entitled to a jury trial. We regard that question as settled for proceedings of this character by *Martin* v. *Martin,* 170 Ill. 18. In that case, as in this, a party entitled to share in the estate applied to the probate court to compel the executors to inventory personalty which one of them claimed to own. That case holds the proceeding is an equitable one; that the Practice act, and its provisions for jury trials and for propositions of law where juries are waived, does not apply. The probate court tries questions relating to the inventories and accounts of executors, administrators and guardians in a summary manner and without a jury. (*Maynard* v. *Richards,* 166 Ill. 466.) Appellant herself invoked the exercise of this summary jurisdiction. There are other reasons why the refusal of appellant's motion was not error.

"The second question proposed for the jury was one which there can be no reasonable claim appellant had a right to have so submitted in a proceeding begun by her in the probate court. The first question proposed,—that is, whether Peter Coffey, on January 7 and 8, 1895, was of a sound and disposing mind and memory,—did not present the question which was in fact in controversy. Even if the executor had claimed Peter made a gift of these shares to him on January 7 and 8, 1895, still the true issue could not be whether Peter was generally of a sound and disposing mind and memory at that date, but whether he had sufficient mind and memory to understand the particular business in which he was then engaged in giving said shares to Thomas. But the claim of the executor was that on June 4, 1887,—two days after he made the will

which was probated,—Peter executed a trust instrument making Thomas a trustee of certain shares of stock (being substantially those now in question) for certain purposes in said instrument set forth, and that Thomas on that day accepted said trust in writing, and that on January 7 and 8, 1895, said Peter Coffey completed the erection of the trust by directing and causing said shares, or other shares in their place, to be transferred to Thomas on the books of the gas company. Manifestly, the completion of an arrangement made in writing seven and a half years before, by directing or authorizing a transfer on the company's books of shares to the trustee so previously appointed and upon trusts so previously fixed, was a transaction which might call for the exercise of much less memory and mental exertion than the making of a new disposition of said shares at the later date. If Peter's direction to transfer the shares was vital to the validity of the title by which Thomas now claims to hold them in trust, then the true question was whether Peter Coffey, on January 7 and 8, 1895, had sufficient mind and memory to complete the trust arrangement (which had been put in writing by him, with all details, in 1887,) by authorizing the transfer of shares on the books of the company. The question appellant asked the circuit court to submit to a jury did not fairly present the true issue to be determined, and a negative answer to it would not necessarily have been decisive of the true issue. She cannot assign for error that some other issue than that she requested should have been submitted to a jury.

"Thomas Coffey was offered as a witness in his own behalf in the circuit court, and appellant denied his competency. The trial judge heard his evidence subject to objection, and afterwards excluded it. In chancery cases it is not error to permit incompetent evidence to be heard before the judge without a jury, subject to objection; and even if no ruling against it is made, the court will be presumed to have acted upon the competent testimony in the

record. (*Gordon* v. *Reynolds,* 114 Ill. 118; *Peabody* v. *Kimball,* 145 id. 519.) This being the rule, there can be no error in such a case as this in letting in the incompetent evidence, where it is afterwards excluded. We proceed to consider the case as if the evidence of Thomas Coffey was not in the record.

"It is claimed by appellant that Peter Coffey was not in a mental condition to transact business at that time. His physician testified he did not consider him competent to transact business during the last two weeks of his life. Certain sisters from the hospitals, who nursed him, and a couple of other witnesses, were of the same opinion, and two of them testified he sometimes seemed to have hallucinations, though this had not been observed by other nurses. The physician stated, however, that Peter had no mental disease, and it is evident from the testimony of the nurses that the only defects they noticed (other than the hallucinations just referred to) were extreme weakness and the results of the laudanum. That drug produced lethargy and drowsiness about fifteen minutes after it was administered, and the effects lasted one and a half or two hours. The doctor gave the nurses a written schedule by which to administer nourishment and the laudanum and other remedies, and it shows that the laudanum was to be given at 10 A. M. and 10 P. M., 'seventeen drops when no pain, thirty to thirty-five drops if pain.' The proof shows laudanum was sometimes given at other times and in still larger doses if the patient was in extreme pain, but there is no proof that the patient was under the influence of that drug anywhere near all the time. The nurses and others testifying for appellant each related, on cross-examination, things Peter Coffey said during the last two or three weeks of his life, which showed him in possession of reason and intelligence. The sisters usually went out of the room when any one was there to talk with him, and if they remained in the room did not attend to the conversation, and hence could

not state the nature and extent of such conversations and his participation in them. On the other hand, the bishop and the business friends and acquaintances of the deceased called upon him at different times during that period and conversed with him, and found him very sick and very weak but intelligent and rational, and all believed him competent to understand and transact business. It is to be noted that Farrelly, the most important witness for appellee, testified against his own interest, as the will of the deceased not only gave him $5000, but also provided that the excess of Peter's estate which might be left after satisfying the legacies therein named, amounting to about $56,000, should be divided *pro rata* among the legatees. No one testified Peter was under the influence of opiates at the time when he transacted his business on January 7 and 8. We have carefully considered the evidence bearing upon his mental condition at that time, and think it justifies the conclusion that he was competent to transact that business. We see no reason to doubt that he wished this last step taken so that his trust arrangement might be carried out and perfected during his lifetime, and that he intelligently comprehended and approved of what was done. This was not a new scheme then devised by him during his last sickness, but the doing of a merely formal and perhaps unnecessary act to more effectually carry out that which he had provided in writing in minute detail when he was in health.

"As to the 335 shares, it is by no means certain the deed of trust or conveyance would fail if it was found Peter was mentally unable, on January 7 and 8, to direct and approve of a transfer on the books of the company. Thomas presented the certificates for those shares at the gas company's office January 8 for transfer, and they had at some previous time been endorsed in blank by Peter Coffey and come into the manual possession of Thomas. If Thomas is not a competent witness to show when and how he received these certificates so endorsed, he is en-

titled to the presumption that they were properly and lawfully in his hands in that condition till the contrary appears. There is no presumption that he came by them improperly. For aught we know outside his testimony, Peter may have personally placed them in his hands, or given him the key to the box where they were, long before and expressly for the purposes of the trust, and if so, we do not doubt he would be entitled to hold them though not transferred on the books. Moreover, on the back of each certificate was a printed assignment and power of attorney to do all acts necessary to transfer said shares required by the by-laws of said company. The places for names and dates were blank. Each was signed by Peter Coffey. Thomas Coffey's possession of these certificates so endorsed *prima facie* authorized him to so fill the blanks as to make them assignments to himself and to cause them to be transferred to himself upon the books of the company, and this without any oral directions from or further action by Peter Coffey. We are unable to see that appellant rebutted the *prima facie* case made by the fact that Thomas Coffey produced these shares at the gas office so endorsed by Peter Coffey.

"The conclusions already stated make it unnecessary for us to decide whether Thomas was a competent witness. So far as the charitable beneficiaries in said deed of trust are concerned, he would be a competent witness for them if their interest could be separated from his. If his testimony was competent it removes every shadow of suspicion cast upon the case, and shows clearly the purpose and previous efforts of the deceased to have his trust arrangement perfected during his life beyond all possible attack.

"We do not regard this as a *donatio causa mortis*, but as a gift *inter vivos*, carried into complete execution during the lifetime of Peter Coffey and conveying entirely beyond his reach the property in question, so that if he had recovered from the illness from which he was suffer-

ing when he took the last steps to perfect the arrange-ment he could not have recalled the property so given away. Therefore the question whether the rights of a widow can be defeated by a gift *causa mortis*, though ar-gued, we consider is not raised by this record.

"The order of the court below is affirmed."

Concurring in the foregoing views and in the conclu-sion reached by the Appellate Court, we affirm the judg-ment of that court.                    *Judgment affirmed.*