**Waldo P. Johnson, Appellant, v. Charles E. Milmine et al., Appellees.**

**Gen. No. 14,533.**

1. CONTRACTS—*what gambling within meaning of statute.* A contract of sale and purchase of grain will be held void if it appears that at the time the sale was made it was the intention of both parties that no delivery of the commodity should take place but that the transaction should be settled by adjusting the difference between the contract and market prices.

2. CONTRACTS—*what not gambling, within meaning of statute.*

The statute does not prohibit a *bona fide* contract of sale and purchase of grain for delivery within a future month where the date of the delivery is made at the option of the vendor by the terms of the contract.

3. CONTRACTS—*what not gambling, within meaning of statute.* If either party to a contract of sale and purchase of grain acts in good faith intending at the time of the making of the contract that there would be delivered thereunder a commodity specified, should be received and paid for, the contract will be valid and binding under the law.

4. CONTRACTS—*burden to establish gambling nature.* The burden of proof to show contracts of sale and purchase of grain were in fact gambling transactions is upon the party who asserts the fact, and proof thereof should be required by a clear preponderance of evidence.

5. PLEDGES—*what evidence of ownership.* A party to whom corporate stock has been endorsed and delivered is thereby vested with the indicia of ownership and a party relying on such apparent ownership and receiving the stock in good faith and for value by way of pledge, will be protected in a court of equity.

6. PLEDGES—*what not conversion by pledgee.* Held, under the evidence in this case, that there was no unlawful conversion by the pledgee of the corporate stock in question.

7. INTEREST—*when properly allowed.* Held, that an allowance of interest upon a stock broker's account was proper, it appearing that prior to the litigation interest had been regularly charged by such broker to the customer and acceded to by him without objection.

Bill in chancery. Appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in the Branch Appellate court at the March term, 1908. Affirmed. Opinion filed July 9, 1909.

**Statement by the Court.** On March 27, 1906, Waldo P. Johnson filed a bill of complaint in this case, setting forth that he is the owner of 222 shares of the capital stock of Borden's Condensed Milk Company, evidenced by four certificates, giving the numbers of the certificates and the number of shares specified in each.

The bill shows that the stock certificates were then in the possession of Borden's Condensed Milk Company, and that for many years past they had stood in the complainant's name on the books of that company

and he had regularly received the dividends thereon; that on February 23, 1906, the defendants, Milmine, Bodman & Company, presented said certificates to Borden's Condensed Milk Company and demanded transfer of them; that the stock was worth $180 per share; that the defendants, Milmine, Bodman & Company, obtained the stock from a party who had obtained possession from the Corn Exchange National Bank for the purpose of delivering them to somebody else than Milmine, Bodman & Company, and that they were wrongfully and fraudulently turned over to Milmine, Bodman & Company; that Milmine, Bodman & Company and the party from whom they obtained the certificates conspired and confederated together to cheat the complainant out of the possession and ownership of the stock and without his knowledge or authority, and entered into certain gambling transactions among themselves and with others, wherein the certificates of stock were used as margins or as collaterals to secure margins.

The bill avers that complainant never authorized the defendants to use said stock for any purpose, and never engaged in any transactions with them; that any right which they claim to have to said stock is without consideration and void; that said defendants have never disposed of said stock as collateral, and that complainant is not able to obtain possession of said certificates, but that he has demanded the same; that Borden's Condensed Milk Company threatens to transfer the stock to defendants. Complainant prays that said stock may be declared to be his sole and separate property and that an order may be entered on the defendants to deliver up the same to him, and on default thereof that a money decree may be entered against the defendants; that the defendants may be restrained and enjoined from making any transfer of said stock.

On April 4, 1906, Borden's Condensed Milk Company filed its answer to the bill, admitting that the defendants presented said stock for transfer, that it

now has possession of the same and that the complainant has demanded the said stock and demanded that it be not transferred; that it has no knowledge of the transaction by which defendants became possessed of said stock; that it holds the stock subject to the order of the court and has no interest therein.

On the same day Borden's Condensed Milk Company filed its cross-bill, setting up how the stock came into its possession from Milmine, Bodman & Company, the latter's demand for transfer, and the demand by Johnson for the stock; that legal proceedings have been begun by Milmine, Bodman & Company in the state of New York to compel the transfer of said stock to them. The cross-bill prays that the parties may be compelled to interplead and settle their right and title to said stock.

On April 4, 1906, an order was entered requiring Borden's Condensed Milk Company to forthwith bring into court the certificates of stock and deposit them in court. This was done and the certificates of stock, as well as $2,228.81 in dividends which accrued to the stock since the suit was instituted, have been deposited with the clerk of the court and by him placed in a safety box in the National Safety Deposit vaults.

May 23, 1906, Milmine, Bodman & Company filed their answer to the cross-bill of interpleader of Borden's Condensed Milk Company and all of the defendants except Mitchell filed their cross-bill against all the other parties to the case and one Jerome Probst. In this answer Milmine, Bodman & Company set forth that one Mitchell is employed as manager of their stock and bond department. They deny that Johnson is the owner of the stock mentioned in the bill. They set forth that Johnson executed a blank assignment on the stock certificates and suffered the same to get into possession of one Jerome Probst, and that Probst had delivered the shares of stock to Milmine, Bodman & Company for a valuable consideration. They admit that the certificates are in the possession of Borden's

Condensed Milk Company and have been placed there by Milmine, Bodman & Company for transfer to them, and say they have no knowledge as to whether the stock stood in the name of Johnson on the books of the company, or that he had been receiving dividends thereon. They aver that Borden's Company had refused to make such transfer. They admit that the stock is of the value of $180 per share and state that the stock certificates came into their possession through Probst, who was a customer of theirs, but whether he obtained them from the Corn Exchange Bank for delivery to someone else they do not admit or deny. They set forth that Probst was clothed with the indicia of ownership. They deny that the certificates were wrongfully and fraudulently turned over to them by Probst, and deny any confederation with Probst. They further deny that they have entered into any gambling contracts among themselves or with Probst or with anyone else, wherein the certificates were to be used as margins in the purchase of grain, coffee, stocks, bonds and other commodities. They admit that complainant never personally authorized them to use said stock. They set forth that the transactions between Probst and the defendants and Probst and the complainant do not affect their stock. They admit that the complainant never personally engaged in transactions with Milmine, Bodman & Co. They set forth that they have never disposed of the said stock as collateral and that they were asking to have the same transferred to them to sell the same and apply the proceeds to the account of said Probst. They aver that Probst, in the usual course of business, authorized and directed the defendants to purchase and sell for his account certain commodities such as wheat, cotton, coffee, railway stocks and other securities traded in by these defendants on the Board of Trade and other exchanges, and gave to the defendants as collateral security for margins the said certificates, together with other securities, and that defendants accepted in good faith the said certificates and other

securities as security for money advanced to Probst; that the market went against said Probst in said trades and said trades were closed out and the losses charged to the account of said Probst, which amounted to $25,853.09, and are still due and unpaid; that the defendants hold the said stock as collateral security to secure the amount of the indebtedness and claim a lien on said stock for the amount of said indebtedness with interest; that they sent the said certificates of stock to New York and demanded transfer to enable them readily to dispose of them.

Milmine, Bodman & Company also answer the cross-bill of interpleader of Borden's Company and set forth that the transfer of stock should be made to them and admit that they began suit against the company in the state of New York to compel transfer.

In a cross-bill filed by Milmine, Bodman & Company they set forth substantially the same facts set forth in their answer and that they have a lien upon the stock for $25,853.09; that the stock is of the value of $40,000 and that they are entitled to have the same sold and deduct the amount of said Probst's indebtedness and credit the amount remaining to the account of said Probst; and pray that the said 222 shares of stock be sold to satisfy said amount. They make Jerome Probst a party to their cross-bill.

On July 14, 1906, the complainant Johnson filed his answer to the cross-bill of Milmine, Bodman & Company in which, after setting up his interest in said stock, he admits that prior to February 23, 1906, one Jerome Probst was a customer of the complainants in the cross-bill and traded in stocks, bonds, grain, cotton and other commodities. Johnson says that Probst placed the stock with them as margins, that all the transactions by said Probst were carried on without any intention of delivering the property pretended to be sold and without any intention of receiving or paying for the property pretended to be bought, and that his intentions were known to and participated in by

Milmine, Bodman & Company, and that the trans-
actions were simply gamblings on the fluctuations of
the market and void and contrary to law; that said
securities were received by Milmine, Bodman & Com-
pany as margins on said trades. Johnson denies that
said defendants received the stock from Probst in
good faith and for a valuable consideration, and avers
that Probst, at the time he placed said stock with de-
fendants, informed Milmine, Bodman & Company that
the stock belonged to him, Johnson, and that the latter
was the owner of the same; that said Probst informed
them that he had no right to pledge or transfer said
stock. The answer denies that the securities placed
by said Probst with cross-complainants were inade-
quate to protect them in any losses sustained by said
Probst. It also denies that the cross-complainants de-
manded of said Probst to put up margins to protect
the trades, and avers that the trades of Probst were
closed out while the securities were amply adequate to
protect the losses; and denies that they lawfully closed
out the trades and charged the losses to the account
of Probst and that there was any sum due to Milmine,
Bodman & Company. The answer admits that they de-
manded the transfer of the stock to their name, but
denies that they had any right to do so. The answer
admits that the stock was of the value of $40,000 and
avers that Probst wrongfully and fraudulently al-
lowed the same to get out of his possession, and that
Milmine, Bodman & Company were cognizant and
knew of such facts as would put a person of ordinary
prudence and capacity upon inquiry with regard to
the ownership of the stock, and that such inquiry
would have disclosed that Johnson was the owner.

On October 29, 1906, Jerome Probst filed his an-
swer to the cross-bill of Milmine, Bodman & Company
in which he set forth that the transactions which he had
carried on and conducted for years with Milmine, Bod-
man & Company were gambling transactions; that Mil-
mine, Bodman & Company wrongfully closed him out;

that they never had any lawful title to the stock, and that the closing out of his trades was without notice to him and while Milmine, Bodman & Company had ample security, and that Milmine, Bodman & Company had knowledge of the fact that Johnson was the owner of said stock.

The case was heard in open court on the testimony of Johnson, the complainant, the deposition of Probst taken in New York on behalf of complainant, and the testimony in open court of L. W. Bodman, Sidney Mitchell and other witnesses for the defendants, and the depositions of employes of various cotton, coffee and stock brokers in New York taken on behalf of the defendants.

A decree was entered March 25, 1907, in favor of Borden's Condensed Milk Company on their cross-bill of interpleader. It recites the deposit of the stock and the dividends accruing thereon by the Borden Company and requires of other parties to litigate their rights to said stock and enjoins them from proceeding against Borden's Condensed Milk Company and dismiss Borden's Condensed Milk Company from the case.

On November 20, 1907, a final decree was entered in the case, dismissing the original bill of Johnson and the cross-bill of Jerome Probst. It found that the contracts, trades and transactions between Milmine, Bodman & Company and Jerome Probst were legal, valid and binding contracts; that Milmine, Bodman & Company received the 222 shares of stock as security for the indebtedness of Probst to them and that there was due from Probst to Milmine, Bodman & Company $28,244.36, and that Milmine, Bodman & Company had a lien on the stock for that amount.

The decree found that the stock belonged to Waldo P. Johnson, free and clear of any claim of Jerome Probst. It ordered the stock sold or so much thereof as should be necessary to pay the amount found due Milmine, Bodman & Company from Probst, and if

there was more stock than sufficient to pay Milmine, Bodman & Company, then the same and the dividends in the hands of the clerk should be turned over to complainant Johnson.

From this decree Johnson appeals to this court.

It appears from the record that Jerome Probst was a lawyer in Chicago, where he had practiced for several years, and that complainant Johnson was his client; that their relations, besides being those of attorney and client, were intimate and that Johnson trusted Probst; that Probst had repeatedly told Johnson of the opportunities that he had in the course of his business as a lawyer to make money by loaning money on mortgages, discounting mortgages and notes, short time loans, etc., and that Johnson was the owner at that time of the certificates described in the bill of complaint.

In 1901 Probst obtained from Johnson a portion of the certificates of stock here in controversy for the purpose of raising money to be used for the joint benefit of himself and Johnson in the purchase of mortgages, discounting notes, etc. At this time and subsequently Probst obtained from Johnson 222 shares of corporate stock of Borden's Condensed Milk Company.

In 1903 and thereafter during the part of the transactions involved in this litigation Milmine, Bodman & Company were brokers doing business on the Chicago Board of Trade and the Stock Exchange of Chicago. Some time in the summer of 1903 Probst opened an account with Milmine, Bodman & Company and at the beginning of his transactions deposited with them a check for $7,500, at the same time informing them that it was his purpose to make purchases and sales on the Board of Trade and the Stock Exchange through them as brokers.

In the course of Probst's transactions with Milmine, Bodman & Company he bought and sold large quantities of corporate stocks, grain, cotton and coffee.

These transactions were very numerous and covered a period of several years and amounted to a large sum in the aggregate. Only a small portion of the stocks and grain, as appears from the record, were ever delivered, nearly all of the transactions being resold before the stipulated time of delivery arrived. From time to time during these transactions different certificates of the shares of stock in question were deposited with Milmine, Bodman & Company as collateral security for margins, as claimed by Milmine, Bodman & Company, or as margins, as claimed by Johnson and Probst, for the stocks and grain purchased and sold by Milmine, Bodman & Company on Probst's account. These certificates of stock belonged to the complainant Johnson, who had been the owner of them for a long time, and when they were deposited with Milmine, Bodman & Company they were all endorsed in blank over the genuine signature of complainant, Waldo P. Johnson. Each certificate of shares had on its back the usual certificate of assignment with blanks for the insertion of the name of the assignee, the date of the transfer, etc., and when deposited with Milmine, Bodman & Company these assignments were wholly blank except as to the signature of Waldo P. Johnson.

It is claimed by Johnson, and the evidence shows, that Probst had no authority to make use of these certificates for his own purposes in connection with these transactions upon the Board of Trade and the Stock Exchange.

FRED H. ATWOOD, FRANK B. PEASE and CHARLES O. LOUCKS, for appellant.

JAMES TODD, for appellees.

MR. JUSTICE SMITH delivered the opinion of the court.

Many errors are relied upon in appellant's brief and argument for a reversal of the decree of the Superior Court. It will not be necessary, in our opin-

ion, to discuss all of them specifically in disposing of the case. The main object and purpose of the bill is to free the 222 shares of the capital stock of Borden's Condensed Milk Company, of which appellant Johnson is the owner as between him and Probst, from the claim of lien of Milmine, Bodman & Company and prevent the transfer of said stock to them, or the sale of the stocks to satisfy the claims of Milmine, Bodman & Company against Probst. The bill and the case made under the bill present the following grounds of relief: First, the transactions between Probst and Milmine, Bodman & Company were gambling transactions and were therefore void under the statute; second, that Milmine, Bodman & Company had actual or constructive notice of the rights of complainant Johnson as owner of the stock; and third, that Milmine, Bodman & Company wrongfully closed out the deals of Probst, and they have no standing to assert and foreclose the lien on the stock under their cross-bill.

The other questions presented and discussed by the able and exhaustive briefs and arguments of counsel on both sides of the case are subsidiary to the questions above stated, and so far as it may be deemed necessary or possible to discuss them within the reasonable limits of this opinion it will be done while considering the questions above stated.

It may be conceded at the outset that if the evidence sustains any one of the grounds above enumerated, the decree is erroneous and must be reversed.

Some leading principles have been established, we think, by the decisions of our Supreme Court and the courts of last resort in other jurisdictions in cases involving similar transactions which have been presented for determination, under similar statutes. Without stopping to quote the statutes which are familiar to the profession we shall state such of those principles as we deem applicable to the transactions now before us.

In the first place, we think it is clear that the statute does not prohibit a *bona fide* contract of sale and

purchase of grain for delivery within a future month, where the day of delivery is made at the option of the vendor by the terms of the contract.

Second. A contract of this character will be held void if it appears that at the time the same was made it was the intention of both parties that no delivery of the commodity should take place, but that the transaction should be settled by adjusting the differences between the contract and market prices.

Third. If either party acted in good faith in making such contract, intending at the time of the making of the contract that there should be delivery thereunder and the commodity specified should be received and paid for, the contract will be valid and binding under the law. This is perhaps a corollary of the last proposition.

In Wolcott v. Heath, 78 Ill. 433, the court said: "Time contracts made in good faith for the future delivery of grain or any other commodity are not prohibited by the common law, nor any statute of this state, nor by any policy beneficial to the public welfare. Such a restraint would limit commercial transactions to such a degree as could not but be prejudicial to the best interests of trade."

In Barnett v. Baxter, 64 Ill. App. 544, it was said: "Transactions of purchase and sale of grain for future delivery are valid, and the fact that the seller has the option to deliver any time during the month for which the sale is made does not render them illegal."

In Pixley v. Boynton, 79 Ill. 351, the court held: "The intent of the parties gives character to the transaction and if either party contracted in good faith he is entitled to the benefit of his contract, no matter what may have been the secret purpose or intent of the other party."

In order to invalidate a contract for the delivery and sale of stocks, grain or other property in the future, it must appear that neither party had the intention to deliver the property, and that both had the intention of settling on differences only. Pratt v.

Ashmore, 224 Ill. 587. Both parties must be shown, (1) not to have had the intention to deliver, and (2) to have had the intention of settling the differences only. Proof of such mutual intention is necessary. Pope v. Hanks, 155 Ill. 617; Ward v. Vosburgh, 31 Fed. Rep. 12.

And in Logan v. Musick, 81 Ill. 415, the court held: "The statute does not prohibit a party from selling or buying grain for future delivery; such was not the purpose of the statute; nor can it make any difference as to the legality of the contract whether the party who sells for future delivery at the time the sale is made has on hand the grain.

"A party may sell today a certain quantity of grain for delivery in a week or a month hence and then go upon the market and buy grain to fill the contract. It is true the defendant had the option under the contract to select a day within a limited time on which he would receive the grain, but such an option does not fall within the statute for the reason that it does not render the sale optional."

Examining the evidence in the record with these principles in mind we find that the main reliance of the complainant for establishing the illegal character of the transactions between Probst and Milmine, Bodman & Company is that Probst was a practicing lawyer in Chicago, and not a man engaged primarily in dealing in grain; that this fact was known to Milmine, Bodman & Company, and that the transactions conducted by them on Probst's orders were greater in extent and volume than could reasonably be undertaken by a man of his financial ability. It also appears from the record that although there were upwards of two hundred and forty-eight accounts of purchases and sales rendered by Milmine, Bodman & Company to Probst from the time he commenced dealing through them as brokers in September, 1901, to February 26, 1906, covering millions of bushels of grain and large quantities of cotton and coffee, there were

few actual deliveries made, and most of the contracts were closed out or changed to other deliveries before the times of delivery arrived. Probst testified directly and positively that the intention on the part of himself and Milmine, Bodman & Company was that there should be no deliveries of the commodities purchased and sold. These and other similar facts are pressed upon our attention as presenting a strong preponderance of proof in favor of the complainant on the gambling character of the transactions between the parties.

Upon a careful consideration, however, of all the evidence on this issue, we are of the opinion that the weight of the evidence is against the complainant, and that the transactions shown in the record were the ordinary transactions on the Chicago Board of Trade and the stock exchanges. We find it difficult to believe the testimony of Probst when he testifies that Milmine, Bodman & Company had the intention, in common with himself, that there should be no deliveries under the contracts made by them on Probst's orders and for his account. They deny such intention squarely and specifically. As stated above, their transactions were made on the Board of Trade and the Stock Exchanges of Chicago and New York, and subject to the rules, regulations and contracts of those bodies. These contracts contemplated delivery and receipt of the commodities bought and sold as between Milmine, Bodman & Company and the parties with whom they executed Probst's orders. It is unbelievable, on the evidence in the record, that Milmine, Bodman & Company would have consented to enter into contracts with other members of the exchanges which required deliveries and receipts of the commodities dealt in, and at the same time agreed with Probst that as between him and them he should not be required to receive the commodities which they purchased for him on his orders, or to deliver what they sold for him—in other words, that Milmine, Bodman & Company agreed for the regular commissions which they were to receive, to stand in the

breach between Probst and the parties with whom they made transactions, taking their commissions if the market was in favor of Probst and standing the loss if the market was against him, with no claims which they could legally enforce against him. We cannot understand how a concern like Milmine, Bodman & Company, whom Probst characterized as "strictly business from the time they open until they close at night," could consent to stand in the breach between Probst and the parties with whom they made contracts, from a purely financial point of view, to say nothing of the deliberate purpose involved to violate the criminal code of the state. This theory of the transactions is inherently improbable.

In this connection the evidence of Probst must be considered. All through his evidence he speaks of conversations with Mr. Mitchell and Mr. Stolz, who were connected with Milmine, Bodman & Company, in regard to deliveries which would be made when certain options matured. And in order to avoid the deliveries contemplated by the transactions which were maturing, new transactions were made in order to change over from one option to another. Probst says: "The object of this was to prevent my being called upon to deliver the wheat if I was short." He further says: "I would have these talks with Mr. Mitchell and Mr. Stolz four times a year or oftener." He refers in this testimony specifically to the regular May, July, September and December deliveries under contracts for those deliveries. Probst thus shows by his own testimony that it was clearly understood and recognized between him and Milmine, Bodman & Company not only that the purchases and sales which they were making in pursuance of his orders contemplated deliveries of the commodities between his brokers Milmine, Bodman & Company, and the parties with whom they dealt, but also as between Milmine, Bodman & Company and himself.

The burden of proof in this case to show that the contracts in question were in fact gambling trans-

actions is upon the complainant who asserts the fact, and in a case like this the complainant should be required to make this proof by a clear preponderance of the evidence. Pixley v. Boynton, *supra;* Ward v. Vosburgh, *supra.* As said in Curtis v. Wright, 40 Ill. App. 491: "Unless we are prepared to hold that all such transactions on the Board are in violation of law and gambling transactions, we cannot hold that the fact that there are no deliveries of grain sold, is conclusive evidence that when the parties made the sale they did not intend to deliver."

The record in this case explains how it came about that there were comparatively few deliveries. The evidence shows that the deals were changed over from one option to another, and thus the actual deliveries were postponed. This was done with Probst's consent and on his orders, and for the purpose of preventing deliveries on the maturing options. The fact therefore that few deliveries were made becomes of little significance on the question as to whether the transactions in question were gambling transactions and void. Clews v. Jamieson, 182 U. S. 461, 492, 494. In this connection the remarks of Mr. Justice Holmes considering a similar question in Chicago Board of Trade v. Christie, etc., 198 U. S. 236, are pertinent.

In Cleage v. Laidley, 79 C. C. A. 284, the court considered a case where a party dealt in 14,000,000 bushels of grain and the contracts for more than ninety-eight per cent. of this property were settled by set-off, and by the payment of differences, and held that this fact did not show an illegal intention or purpose.

The rules and laws of the Chicago Board of Trade, the Chicago Stock Exchange and the New York Stock Exchange, in which markets all the transactions here involved were made, provided for, contemplated and intended the delivery of the property dealt in. That Probst knew this, and gave his orders with this understanding, is fully shown by his testimony and by what he did during the four years or more covered by the transactions. In the first notice of confirmation of

sales received by him from Milmine, Bodman & Company on September 3, 1901, he was notified in writing that all purchases and sales made for him were made in accordance with and subject to the rules and regulations of the different markets where the transactions were made for him. Every confirmation of sales received by him subsequently contained the same notice. The record fully justifies us in the conviction that Probst fully understood that all the transactions made for him were of the character contemplated by the rules and laws of these exchanges, and required deliveries to be made. Our conclusion from the evidence is that they were so made; and that there was no understanding between Probst and his brokers or intention on the part of Milmine, Bodman & Company not to deliver but to settle by the payment of differences between the contract price and the market price.

The next question for consideration is whether Milmine, Bodman & Company had actual or constructive notice of the rights of complainant Johnson as owner of the shares of stock in question.

The position taken by complainant in his original bill is that Probst and Milmine, Bodman & Company entered into a combination and conspiracy to cheat and defraud complainant Johnson out of the 222 shares of the Borden's Company stock. No evidence was introduced to sustain these allegations of the bill, and solicitors for complainant in their argument do not claim or contend that there was such a combination or conspiracy by which Milmine, Bodman & Company came into possession of the certificates. This contention in the bill may therefore be dismissed from further consideration.

In his answer to the Milmine cross-bill Johnson bases his claim to the stock upon the ground that Probst, at the time he delivered the stock to Milmine, Bodman & Company, informed them that the stock belonged to Johnson, and that he, Probst, had no right to pledge or transfer and convey the stock.

The only evidence offered in support of this aver-

ment of notice of Johnson's interest in the stock was
that of Probst, who testified that along in the summer
of 1905, he had a conversation with Mr. Mitchell of
Milmine, Bodman & Company, who told him they were
not satisfied with the certificates being in the name of
Dr. Johnson, while he was drawing the dividends as
the ostensible owner; that Mitchell further said they
would feel much safer if the stock was transferred to
themselves, or if not to themselves to him, Probst;
and thereupon he—Probst—told Mitchell that Dr.
Johnson had an interest in the stock, and that he was
certain Dr. Johnson would not consent to the transfer
of the stock to anyone, and that he would not care to
ask him to make the transfer. Probst further says
the matter was then dropped, but was taken up again
on three or four occasions, the last time along in the
early part of November, when Mitchell said: "We
can't carry your account on stock margins with this
Borden's stock unless it is transferred from Johnson's
name to us or to you." Probst says that he replied
that he would not transfer it, or ask to have it trans-
ferred, as Dr. Johnson had an interest in the stock;
that they—meaning Milmine, Bodman & Company—
would either take his business with the stock in its
then condition or he would transfer his account else-
where, and the result was that Mitchell dropped the
matter and decided to continue carrying his account
on the Borden's stock margins. After this talk he says
he redeposited the little certificate in the middle of
November. Then in the latter part of November, 1905,
he deposited the larger ·certificate for 100 shares, and
in the early part of the following December another
certificate, and in January, 1906, another share certifi-
cate which gave them control and possession of all four
certificates. Mitchell expressly and specifically denies
that Probst ever told him at any of the times when the
stock was put up by him that Johnson had an interest
in it; he testified that the first conversation he had
with Probst as to Johnson's interest in the stock was

on February 26, 1906, when Mitchell informed Mr. Bodman that Johnson had served the notice on the Borden Company that the 222 shares had been stolen from him, Johnson; that he did not request Probst to have the certificates of the Borden's Company stock transferred to himself or to Milmine, Bodman & Company; that he did not tell Probst that Milmine, Bodman & Company were dissatisfied with the certificates being in the name of Dr. Johnson and that Dr. Johnson was drawing the dividends; that he did not say to Probst that they were carrying the stock as margins or mention it to him; that nothing was ever said about taking it as margins. Mitchell had a conversation with Probst in Milmine, Bodman & Company's office, when he deposited the stock, October 31, 1904. He said he would leave the stock as collateral, that it was perfectly good, and Milmine, Bodman & Company could get a quotation from New York on it, and they obtained such quotation.

Mitchell testified that in the conversation on February 26, 1906, in regard to the notice served by Johnson, Probst said that it was nonsense about the stock being stolen from Johnson; and several days later after Probst deals had been closed out Probst told him, Mitchell, that he had papers which showed that he had a perfect right to use the stock, and that Johnson had a half interest in his transactions with Milmine, Bodman & Company and had received half of all the checks which that firm had paid Probst. Here again, on this question of notice to Milmine, Bodman & Company of Johnson's interest in the stock in question, we find it difficult to believe Probst's testimony. It is inherently improbable. Probst is personally interested in the issue of this litigation. A decree in favor of complainant Johnson would be greatly to the advantage and benefit of Probst. The great discrepancy between his pleadings and his testimony, and between his direct and his cross-examination, and between his testimony and his own letters and telegrams and the documentary

evidence in the case, all lead us to accept the testimony of Mitchell rather than that of Probst.   We cannot believe that when he offered this stock as collateral security for margins, or as margins as he puts it, that he would give notice that he was not the sole owner of it, for he knew as a lawyer that Milmine, Bodman & Company could obtain no lien upon or rights in the stock as against Johnson, if they had notice of Johnson's ownership of, or interest in, the stock, and that such notice would in all probability defeat his purpose in attempting to pledge the stock.   Johnson had endorsed the stock and delivered it to Probst, thus giving him evidence that it was his, Probst's, stock (McCarthy v. Crawford, 238 Ill. 38).   Why should he, by giving notice of Johnson's interest, start an inquiry which in all probability would defeat his immediate object, and make the stock useless in his hands?   Such a notice would have been evidence to Milmine, Bodman & Company that Probst was dishonest toward Johnson, or dishonest with them, for, according to his own version of the facts, he had deceived them by suppressing the truth in regard to the ownership of the stock when he first pledged it to them as security for margins, or as security for a loan of money.   If he intended to put up as security for his own transactions another man's property, naturally and ordinarily he would have said nothing about it.

Considering the situation, the relations of the parties, the probability or improbability of the truth of the conflicting testimony of Probst and Mitchell and the interest of Probst in the outcome of the case, we think the weight of the evidence is decidedly against the claim of the complainant Johnson that Milmine, Bodman & Company had notice of Johnson's rights in the stock at the time it was delivered to them as security.

We are further of the opinion that on the principles announced in McCarthy v. Crawford, *supra,* and the authorities there cited, the blank transfers on the backs of the certificates of stock signed by complainant John-

son, as shown by the evidence, were good assignments to Probst when delivered to him, and that complainant Johnson can set up no equities in the stock as against Milmine, Bodman & Company, who took them for value in the ordinary course of business, in good faith and without notice of the rights or equities of complainant Johnson, even though it appears that Probst had diverted the stock from the purposes for which it was delivered to him.

Where the owner of title to property confers upon another an apparent title to, or power of disposition over it, he is estopped from asserting his title as against an innocent third party who has dealt with the apparent owner in reference thereto, without knowledge of the claims of the true owner. The rights of the third party do not depend upon the actual title or authority of the one with whom he dealt, but upon the act of the owner, which precludes him from disputing the title or authority he has apparently conferred. Pomeroy Eq. Jurs. (3d Ed.), pp. 1242 to 1248. Williams v. Fletcher, 129 Ill. 356; Otis v. Gardner, 105 Ill. 436, 442; Coffey v. Coffey, 179 Ill. 283.

We think the evidence in the record brings the case fully within the authorities and principles above stated and that complainant Johnson, having by his endorsement and delivery to Probst of the certificates of shares placed them in such condition that they could be readily sold or hypothecated by him, can get no relief in equity against that which he authorized to be done, where, as in this case, such relief would affect injuriously an innocent purchaser or pledgee for value.

It is contended on behalf of complainant that Milmine, Bodman & Company held the certificates of stock as margins, not as collateral security for the payment of margins. The evidence, in our opinion, does not sustain this contention. Milmine, Bodman & Company from time to time made loans of money to Probst as well as being his brokers. On April 27, 1905, he borrowed of them $1,000, and as security for the payment

of it he deposited with them three railroad bonds. In the following August he borrowed $3,000 and deposited the same bonds with them as collateral security, the former loan having been paid and the bonds returned to him. On October 27, 1905, he borrowed of appellees $3,500 and deposited with them fifty shares of the Borden stock as collateral security for the loan. On November 20, 1905, he borrowed $7,500 of appellees, and as collateral security he deposited with them 120 shares of the Borden stock. He received checks for all these loans. The amounts of these loans were charged to him in his account and memoranda were made on the ledger of Milmine, Bodman & Company of the collateral deposits and were copied into the monthly statements mailed to him. Some of these loans remained unpaid at the time Probst trades were closed out. As to these deposits of bonds and stocks there is no reasonable question on the evidence that they were made as collateral to secure the loans.

As to the deposits of the Borden stock as margins, or as security for margins as contended by Milmine, Bodman & Company, the evidence is substantially confined to the testimony of Probst, Mitchell and Bodman, and certain receipts, letters and telegrams which passed between Probst and appellees. Upon a careful consideration of the evidence we have reached the conclusion that the stocks in question were deposited with Milmine, Bodman & Company as collateral security for the payment of the margins, and not as margins.

The contention is also made on behalf of complainant that, by sending the stock to New York for transfer on the books of the Borden Company and by refusing to deliver the stock to Probst on his demand made on February 26, 1906, Milmine, Bodman & Company converted the stock, and that the conversion at that time resulted in Milmine, Bodman & Company having in their hands $40,000 in money which was amply sufficient to margin Probst's deals.

This contention is based upon the testimony of Probst that Milmine, Bodman & Company agreed to

carry his trades on the stock as margins without having it transferred to their name, and that he notified them at the time he deposited the stock that it belonged to Johnson. These matters we have discussed above and will not be further considered here. The evidence shows that Milmine, Bodman & Company had made repeated demands upon Probst not only for additional security for margins, but that he should take up the stock and deposit money for his margins before the stock was sent to New York, and these demands had resulted in nothing but promises. The letter which accompanied the stock to New York does not evidence any desire or intention on the part of appellees to wrongfully convert the stock to their own use. The letter says: "We are holding this as collateral for a customer who has considerable loss in open trades in grain and as it may be necessary for us to sell this security, we would like to have it transferred into the name of Milmine, Bodman & Company. * * * We would prefer to hold the stock if possible. We accepted it temporarily only until he could raise funds from another source which he promised to do and has not yet done."

Mr. Mitchell testified that the stock was sent to New York for registration and to facilitate delivery.

We do not think Milmine, Bodman & Company wrongfully converted the stock to their own use, in violation of the terms and conditions under which they held it.

The next question is, were the trades of Probst illegally closed out by Milmine, Bodman & Company? The evidence shows that from January 30, 1906, to February 26, 1906, Milmine, Bodman & Company, by letters and telegrams and finally by personal interviews, were in constant communication with Probst on the subject of the market and his account which on February 26, 1906, showed a loss of substantially $25,000; and further that appellees were entitled to receive from Probst an additional sum of substantially $15,000 to protect and carry his open trades. The sub-

ject of the claims being made in New York that Probst did not have good title to the stock in question was discussed between appellees and Probst, the latter claiming that ''it was all nonsense about the stock being stolen and that he would fix the matter up.'' About eleven o'clock on February 26, 1906, Probst was notified by appellees that the market in his trades was declining, and that his trades would be closed out unless he took care of them at once. Probst took no steps to take care of his transactions, did not deposit any sum whatever with appellees, although he had promised to deposit $40,000, and after one o'clock on that day his trades were regularly closed out after notice and in conformity with the rules of the Board of Trade of Chicago and the exchanges in New York under which it was distinctly and clearly understood by the parties the transactions were made. In our opinion the trades were legally and properly closed out after due notice.

It is urged that the decree in favor of Milmine, Bodman & Company on their cross-bill is excessive. The amount of the decree appears to have been arrived at by taking the balance due on February 26, 1906, $28,-320.89, and adding interest on that amount at six per centum, the rate regularly charged in all the monthly statements to Probst without objection, to the date of the decree, making the total amount $31,266.52. Probst was credited on April 26, 1906, with $2,762.50, and interest on that amount at the same rate from date of payment, making a total credit of $3,022.16. This taken from $31,266.52 leaves the amount of the decree. We know of no reason why interest should not be allowed, and at the rate agreed upon by the parties.

The decree is in conformity with the legal and equitable rights of the parties and must be affirmed.

*Affirmed.*

MR. JUSTICE MACK took no part in the consideration of this case.